CHARAL INVESTMENT COMPANY, INC., and C.W. Sommer & Co., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

David ROCKEFELLER; Peter D. Linneman; Richard M. Scarlata; Goldman Sachs Mortgage Co.; Whitehall Street Real Estate Limited Partnership V; WH Advisors, L.P.; WH Advisors, Inc. V; Goldman Sachs Group Inc.; Goldman Sachs & Co.; and Daniel M. Neidich, Defendants.

No. Civ. A. 96–543(RRM).

United States District Court, D. Delaware.

March 12, 2001.

**594**

Pamela S. Tikellis, James C. Strum, Chimicles & Tikellis LLP, Wilmington, DE, Michael D. Donovan, David A. Searles, Ann Miller, Donovan Miller, LLP, Philadelphia, PA, James R Malone Jr., Chimicles & Tikellis, Haverford, PA, for Plaintiffs.

Robert K. Payson, Arthur Dent, Potter Anderson & Corroon LLP, Wilmington, DE, for defendants Peter D. Linneman, Richard M. Scarlata, Goldman Sachs Mortgage Co., Whitehall Street Real Estate Limited Partnership V, WH Advisors, Inc. V, WH Advisors, L.P., Goldman Sachs Group, Inc., Goldman Sachs & Co., and Daniel M. Neidich.

Max Gitter, Cleary Gottlieb Steen & Hamilton, New York City, Richard A. Rosen, Robert N. Kravitz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Goldman Sachs Mortgage Co., Whitehall Street Real Estate Limited Partnership V, WH Advisors, Inc. V, WH Advisors, L.P., Goldman Sachs Group, Inc., Goldman Sachs & Co., and Daniel M. Neidich.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Russell E. Brooks, Milbank, Tweed, Hadley & McCoy, New York City, for defendant David Rockefeller.

## OPINION

McKELVIE, District Judge.

This is a securities case. Plaintiffs owned shares of stock in a real estate investment trust called Rockefeller Center Properties, Inc. ("RCPI") between February 8, 1996 and July 10, 1996 and purport to represent all others who owned shares of RCPI during the same time period. RCPI held mortgages on Rockefeller Center property through 1996, at which time the property was transferred to RCPI. In July, 1996, a group of investors (the "In-

vestor Group") acquired RCPI through a cash-out merger with RCPI Merger, Inc., a corporation created by the Investor Group.

Defendants include the following former officers and directors of RCPI. David Rockefeller is a former officer and director of RCPI and was a member of the Investor Group. Peter D. Linneman is a former director of RCPI and a consultant to Goldman Sachs & Co. Richard M. Scarlata is a former President and CEO of RCPI. Daniel M. Neidich is a former director of RCPI.

Defendants also include the following corporations and partnerships that were members of the Investor Group. Whitehall Street Real Estate Limited Partnership V is a limited partnership organized under the laws of the State of Delaware that engages in the business of investing in debt and equity interests in real estate assets and businesses. WH Advisors, L.P. is a limited partnership organized under the laws of the State of Delaware and sole general partner of Whitehall. WH Advisors, Inc. V is a corporation organized under the laws of the State of Delaware and the sole general partner of WH Advisors, L.P. Goldman Sachs Group, Inc. is a corporation organized under the laws of the State of Delaware that engages both directly and through subsidiaries in the business of buying and selling securities and making investments. Goldman Sachs & Co. is a limited partnership organized under the laws of the State of New York that engages in investment banking. Finally, defendant Goldman Sachs Mortgage Co. is a limited partnership organized under the laws of the State of New York engaging in commercial lending and was an indirect investor in the Investor Group.

Plaintiffs allege in their Second Consolidated Amended Class Action Complaint that defendants violated Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n, 78j, 78t (the "Exchange Act"), when, prior to the March 25, 1996 shareholder vote approving the merger of RCPI and RCPI Merger, Inc., they failed to disclose the Investor Group's intent to sell certain RCPI real estate to GE/NBC. This is the second time the court has analyzed claims based on these facts.

Plaintiffs first brought claims based on defendants' alleged failure to disclose the Investor Group's intentions before the court in their initial consolidated complaint filed on March 3, 1997. Defendants moved to dismiss the complaint. On December 10, 1997, the court converted defendants' motion to dismiss to one for summary judgment and granted judgment in favor of defendants as to claims relating to defendants' failure to disclose the Investor Group's sale intentions. On appeal, the Court of Appeals for the Third Circuit determined that this court had improperly converted the motion to dismiss and remanded the claims so that the parties could frame their arguments in light of recent Third Circuit authority. *See In re: Rockefeller Center Properties, Inc. Securities Litigation,* 184 F.3d 280, 289 (3d Cir. 1999).

Upon the parties' return to this court, plaintiffs moved for leave to amend their complaint. On July 8, 2000, the court granted plaintiffs' motion. In amending their complaint, plaintiffs added a third statutory ground for liability and supplemented their statement of facts in an effort to demonstrate that prior to the shareholder vote, defendants failed to disclose the Investor Group's intent to sell the RCPI real estate to GE/NBC after approval of the merger. On July 24, 2000, defendants moved to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u–4(b) of the Private Securities Litigation Reform Act (the "PSLRA"). On July 27, 2000, plaintiffs moved to strike defendants' motion to dismiss. This is the court's decision on the motions.

## I. FACTUAL BACKGROUND

The court draws the following facts from plaintiffs' Second Consolidated Amended

Complaint and documents referenced therein.

## A. *RCPI*

Rockefeller Center is a large office, retail and entertainment complex located in midtown Manhattan. Prior to the spring of 1996, Rockefeller Group, Inc. owned Rockefeller Center through two partnerships, Rockefeller Center Properties and RCP Associates. In 1985, RCPI was created to loan cash to the partnerships. RCPI used $750 million from an initial public offering of 37.5 million shares of stock and $215 million from a sale of discounted debentures to loan $1.3 billion to the partnerships. To secure the loan, RCPI received two mortgages on the Rockefeller Center property. The mortgages were set to mature on December 31, 2007.

## B. *RCPI's Money Problems*

In the fall of 1994, RCPI realized that it would be unable to honor upcoming debenture payments without raising additional cash. In December, 1994, RCPI entered into financing agreements with defendants Whitehall and Goldman Sachs Mortgage Company. Whitehall provided a $150 million loan to RCPI. In return, RCPI gave Whitehall an assignment of part of the Rockefeller Center mortgage, warrants for RCPI stock and a pledge to pay over to Whitehall certain defined "excess" cash. Goldman Sachs agreed to buy $75 million in debentures from RCPI. As part of the transaction, RCPI agreed to Goldman Sachs appointing one member of RCPI's board of directors. Goldman Sachs subsequently designated defendant Daniel M. Neidich to serve on the board. Neidich served as a director until his resignation in August, 1995.

The partnerships that owned the Rockefeller Center property were also experiencing financial difficulties. On May 11, 1995, they filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code and ceased payments to RCPI. Four months later, on September 12, 1995, the partnerships filed a proposed chapter 11 plan of reorganization, in which they agreed to transfer full ownership of the Rockefeller Center property to RCPI.

Realizing that RCPI would receive no further payments on the mortgage, the RCPI board of directors met to assess their position and consider alternative financing options to alleviate the loss of income. The board concluded that a large payment due to Goldman Sachs on September 1, 1995 would exhaust the RCPI cash reserves and that any new financing would have to be in place by mid-August.

The board entertained various proposals ranging from refinancing plans from RCPI's lenders to acquisition plans from outside entities. The board appointed a committee to assess its options. On August 7, 1995, in a meeting to consider some of the proposals that had been made to RCPI, the committee also considered filing for protection under chapter 11 of the Bankruptcy Code. The committee instead decided to pursue the recapitalization and acquisition proposals.

## C. *The Cash–Out Merger*

Three groups of investors expressed significant interest in acquiring RCPI. The first was the Investor Group, which consisted of Whitehall, David Rockefeller, Goldman Sachs & Co., and Daniel M. Neidich. The second was the Zell Group, led by Samuel Zell, a Chicago real estate investor, and included GE. The third was the Gotham Group, led by Gotham Partners, L.P., an investment firm that owned 5.6% of RCPI's shares. The three groups engaged in a bidding contest to buy RCPI.

On August 16, 1995, RCPI entered into an agreement and plan of combination with the Zell Group, in which the Zell Group pledged $250 million in cash and $700 million in new financing. As part of the agreement, the Zell Group loaned RCPI $10 million to cover payments due to lenders on September 1, 1995. The agreement

also allowed RCPI to continue to consider other offers and to pursue any offers it considered financially superior. On September 12, 1995, the Investor Group proposed to buyout RCPI for an aggregate price of $100 million. The RCPI board rejected the offer concluding that it was not financially superior to the Zell Group's proposal.

The three groups of investors continued to increase their bids through the fall of 1995. The Gotham Group eventually offered $105 million. RCPI's financial advisor valued the final Zell Group proposal at between $7.65 and $7.76 per share. The Investor Group's final bid was all cash at $8.00 per share. At a November 7, 1995 meeting, RCPI's board of directors terminated its agreement with the Zell Group and accepted the Investor Group's proposal after determining that the Investor Group bid was financially superior to the other proposed alternatives.

RCPI filed a preliminary proxy statement with the SEC in December, 1995, outlining the proposed merger with the Investor Group. On February 14, 1996, RCPI filed its final proxy statement and disseminated it to shareholders. The proxy statement contained a detailed description of the proposed Investor Group merger. RCPI attached to the proxy statement PaineWebber's report evaluating the merger. In the report, Paine-Webber concluded that "the consideration to be received by holders of Common Stock ... in connection with the Merger is fair, from a financial point of view, to such holders." The proxy statement also contained numerous references to a December 31, 1994 appraisal of RCPI's assets done by the Douglas Elliman Company. In this report, Elliman determined the fair market value of Rockefeller Center to be approximately $1.25 billion. RCPI filed this report with the SEC on December 15, 1995.

RCPI sent a letter accompanying the proxy statement to the shareholders. In the letter, defendants Linneman, chairman of RCPI's board, and Scarlata, president and CEO of RCPI, described the Investor Group proposal and invited the shareholders to a special meeting to vote. They explained that RCPI had also entered into a separate agreement with Whitehall and Goldman, Sachs & Co., in which the parties had agreed that if RCPI's shareholders did not approve the merger with the Investor Group, RCPI would have the right to make a $200 million publicly registered rights offering at a price set by RCPI's board of not less than $6.00 per share. The letter stated that the purpose of the agreement was to enable RCPI to acquire the Rockefeller Center property and to meet its obligations in the event that the RCPI shareholders did not approve the merger agreement. The letter further stated that no decision had been made by the RCPI board as to whether this option would be exercised if the RCPI shareholders did not approve the merger agreement.

RCPI also sent a letter to the shareholders from the board of directors stating that "[t]he Board of Directors has unanimously approved the Merger Agreement, has determined that the Merger Agreement is fair to and in the best interests of RCPI and its stockholders and recommends that you vote FOR approval and adoption of the Merger Agreement." The proxy statement indicated that the board was concerned about RCPI's ability to stay solvent if the Investor Group proposal was not approved. It stated that "RCPI could be subject to substantial uncertainties," and that there "can be no assurance as to the availability to RCPI of any alternatives to proceeding with the Rights Offering." It went on to state that there was no assurance that the rights offering would be successful, and that even if it were, the board believed still more funds would be required in order to be able to take over ownership of the Rockefeller Center property.

On March 25, 1996, the shareholders approved the Investor Group's buyout

plan. The merger was completed on July 10, 1996.

### D. *The GE/NBC Transaction*

The proxy statement informed shareholders that if the merger was approved, the Investor Group intended to take title to Rockefeller Center and raise at least $430 million in new financing. It stated:

It is expected that immediately following the Merger, the Property ... will be conveyed to the Surviving Corporation or its designee ... pursuant to the Borrower's Chapter 11 Plan.... The Investors currently intend that, following the Merger, at least $430 million in new debt financing would be raised and that a portion of the proceeds thereof would be used to repay the indebtedness outstanding under the Floating Rate Notes and the Current Coupon Convertible Debentures. In addition the Investors may decide to incur additional financing and use the proceeds to repay the Convertible Debentures.... The Investors' financing plans may change in light of changes in market conditions and other considerations.

The proxy statement also contained several statements relating to GE's interest in investing in or providing financing for RCPI. GE is the parent company of NBC, which in 1995 was leasing approximately twenty percent of Rockefeller Center and using the space to house its offices and broadcast studios.

First, the proxy statement described a transaction between RCPI and GE that had taken place in September, 1995, in which the parties modified NBC's lease and added a guarantee on the lease by GE, so that RCPI could obtain "lease financing." RCPI also reported this transaction to the SEC in its February, 1996 Schedule 13E–3. Second, in connection with the proposed rights offering if the merger was not approved, the proxy statement mentioned the possibility of a "credit lease financing arrangement relating to a lease from, or guaranteed by, GE." Third, the proxy statement repeatedly referred to GE's role as a member of the Zell Group, and mentioned specific proposals from the Zell Group to RCPI that involved financing or guarantees from GE.

On April 23, 1996, nearly a month after the shareholders had approved the merger, RCPI agreed to sell the NBC-leased premises to GE/NBC for $440 million.

## II. *PROCEDURAL BACKGROUND*

On November 15, 1996, certain plaintiffs filed a complaint alleging that defendants violated Sections 10(b) and 14(a) of the Exchange Act by engaging in a "fraudulent, deceptive and materially misleading proxy solicitation" process that resulted in RCPI's shareholders approving the merger of RCPI and RCPI Merger, Inc. These plaintiffs alleged that defendants had failed to disclose, or had made false representations about, several facts relating to RCPI's financial situation including the Investor Group's intent to sell RCPI property to GE/NBC and RCPI's ownership of certain development rights, ("the air rights").

On January 13, 1997, the court consolidated this case with two others involving similar claims brought by other plaintiffs against the same defendants. On March 3, 1997, plaintiffs filed their First Consolidated Amended Class Action Complaint, alleging that defendants had violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b–5 and 14a–9 promulgated thereunder. Plaintiffs contend that defendants violated these provisions by: (1) failing to disclose the Investor Group's intention to sell a portion of Rockefeller Center to GE/NBC; (2) failing to disclose the existence of air rights and the fact that the Investor Group would acquire them if its merger bid was approved; (3) failing to disclose the interest of certain companies in leasing property at Rockefeller Center at premium rates; and (4) understating the potential alternatives to the merger.

On April 30, 1997, defendants moved to dismiss the First Consolidated Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the PSLRA, arguing that the Investor Group did not fail to disclose a material fact or make an affirmative misrepresentation, and that plaintiffs had failed to state a claim upon which relief could be granted.

On December 10, 1997, the court issued a Memorandum Opinion concluding that the defendants' motion to dismiss should be treated as one for summary judgment, and granting judgment in favor of defendants as to plaintiffs' fraud claims relating to the Investor Group's alleged failure disclose its intention to sell the RCPI real estate to GE/NBC. The court found that it did not have sufficient facts to resolve the issue of whether defendants' failure to disclose ownership of the air rights was a material omission. The court invited the parties to submit further evidence on that issue.

On March 4, 1998, defendants submitted additional evidence on the air rights issue and moved for summary judgment on plaintiffs' remaining claims. On July 10, 1998, the court issued a Memorandum Opinion granting judgment in favor of defendants. Plaintiffs appealed the decision to the Third Circuit based on defendants' alleged failure to disclose both the existence of air rights and the Investor Group's intent to sell portions of RCPI real estate to GE/NBC.

On July 19, 1999, the Third Circuit affirmed the court's grant of summary judgment in favor of defendants as to the air rights issue. *See Rockefeller,* 184 F.3d at 290. The Third Circuit, however, ruled that the court erred in failing to notify plaintiffs that it was converting defendants' motion to dismiss all plaintiffs' claims to one for summary judgment, vacated this court's grant of summary judgment as to plaintiffs' claims relating to defendants' alleged failure to disclose the Investor Group's sale intentions and re-manded the case for the parties to frame their arguments in light of the Third Circuit decision in this case and *In re Advanta Corporation Securities Litigation,* 180 F.3d 525 (3d Cir.1999). *See id.* at 289.

On August 30, 1999, plaintiffs moved for leave to file a second amended complaint in accordance with the Third Circuit's decision. On October 29, 1999, defendants moved to dismiss the First Consolidated Amended Complaint and opposed plaintiffs' motion for leave to amend. In support of their motion, defendants argued that plaintiffs' proposed amended complaint failed to state a claim upon which relief could be granted, and thus, amendment of the complaint was futile. On April 26, 2000, the court heard oral argument on the pending motions.

On July 18, 2000, the court granted plaintiffs' motion for leave to file a second amended complaint. On July 21, 2000, plaintiffs filed their Second Consolidated Amended Complaint. The second complaint is similar to the First Consolidated Amended Complaint in that it alleges violations of Sections 14(a) and 10(b) of the Exchange Act and their related rules. As in their first complaint, plaintiffs allege that defendants violated the Exchange Act provisions by failing to disclose prior to the shareholder vote, that the Investor Group intended to sell RCPI property to GE/NBC for $440 million after the merger was approved. Unlike the first complaint, however, the second complaint also alleges a violation of Section 20(a) of the Exchange Act based on the same facts.

In their first complaint, plaintiffs identified articles in *The Wall Street Journal* and *The New York Daily News* as evidence of the Investor Group's intention. In the second complaint, plaintiffs point to the same articles and add references to two statements made by personnel from Goldman Sachs in February and March of 1996, a letter of intent between RCPI Merger, Inc. and GE/NBC executed on April 25, 1996, statements from the part-

nerships' bankruptcy proceeding held on May 6, 1996 and a May 22, 1996 letter to the New York State Department of Law as further evidence of the Investor Group's intention.

On July 24, 2000, defendants responded by moving to dismiss the Second Consolidated Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the PSLRA. Defendants argue that plaintiffs have failed to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 9(b) and the heightened pleading standards of the PSLRA. In support of their motion, defendants refer the court to arguments set out in papers previously submitted in support of their motion to dismiss the First Consolidated Amended Complaint and in opposition to plaintiffs' motion for leave to file the Second Consolidated Amended Complaint. In these papers, defendants argue that the Investor Group did not fail to disclose a material fact or make an affirmative misrepresentation in violation of ·Sections 14(a), 10(b) or 20(a) of the Exchange Act.

On July 27, 2000, plaintiffs responded to and moved to strike defendants' motion to dismiss, arguing that the court had already applied the standards of Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 9(b) and the PSLRA (the "futility standards") to the Second Consolidated Amended Complaint when considering plaintiffs' motion for leave to amend their first complaint. On August 1, 2000, defendants filed a memorandum in opposition to the motion to strike, arguing that the court had not applied the futility standards in granting plaintiffs' motion for leave to amend their First Consolidated Amended Complaint.

On August 8, 2000, plaintiffs filed a reply memorandum in support of their motion to strike reiterating their position and arguing that authority cited by defendants in their memorandum in opposition to the motion to strike is inapplicable to the present dispute. The court will assess each motion in turn.

## III. DISCUSSION

### A. Should the Court Grant Plaintiffs' Motion to Strike?

■ Plaintiffs argue that defendants' motion to dismiss should be stricken because the court applied the futility standards when it granted plaintiffs' motion for leave to amend their complaint. Plaintiffs contend that in granting leave to amend, the court implicitly determined that the Second Consolidated Amended Complaint satisfied the pleading requirements of Fed. R.Civ.P. 12(b)(6), Fed.R.Civ.P. 9(b) and the PSLRA. Defendants counter by arguing that in granting the motion for leave to amend, the court did not address the merits of the proposed complaint, but instead ruled only on the narrow issue of whether plaintiffs would be permitted to file a second amended complaint.

In support of the motion to strike, plaintiffs refer the court to a number of cases that plaintiffs argue establish an obligation or requirement on the part of courts to apply the futility standards in deciding whether to grant leave to amend. Most significantly, plaintiffs cite *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210 (3d Cir.1999), *Kiser v. General Electric Corp.*, 831 F.2d 423 (3d Cir.1987), and *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir.1997), for the proposition that courts considering proposed amendments to a complaint attacked as defective have a duty to consider the merits of the proposed amendments before granting leave to amend. The court, however, finds that these cases do not require that courts apply the futility standards in granting leave to amend in all instances.

In *Chemical Leaman Tank Lines*, the Third Circuit recognized a duty to consider the merits of a proposed amendment in the context of 28 U.S.C. § 1653 and a request to amend a defective allegation of jurisdiction. *See* 177 F.3d at 222 n. 13. The Court recognized the same duty in *Kiser.*

*See* 831 F.2d at 427. Plaintiffs motion for leave to amend, however, was not for the purpose of curing a defective allegation of jurisdiction. Rather, plaintiffs requested leave to amend their complaint in order to reconstruct their claims in light of the Third Circuit decisions in *Rockefeller*, 184 F.3d at 280, and *Advanta*, 180 F.3d at 525, a course of action suggested by the Third Circuit in *Rockefeller*. *See* 184 F.3d at 289. In addition, plaintiffs requested leave to eliminate from the complaint a number of claims resolved in *Rockefeller*, and to update the complaint with evidence gathered since the court's prior decision in this case and during the pendency of the appeal of that decision. *Chemical Leaman Tank Lines* and *Kiser* have no binding effect in this case because plaintiffs did not request leave to amend for the purpose of correcting a defect in an allegation of jurisdiction.

In *Burlington Coat Factory*, the Third Circuit determined that the District Court for the District of New Jersey could apply the standards of Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b) in deciding whether to grant leave to amend a complaint. *See* 114 F.3d at 1434. The Third Circuit, however, did not recognize a duty or otherwise require that courts apply the futility standards in ruling on a motion for leave to amend a pleading. Rather, application of the futility standards was an option available to the court. *See id.* ("Among the grounds that could justify a denial of leave to amend [is] . . . futility.") (quoting *Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993)). This position has been reiterated in more recent Third Circuit decisions. In *Shane v. Fauver*, the Third Circuit stated that "[a]mong the grounds that *could* justify denial of leave to amend [is] . . . futility." 213 F.3d 113, 115 (3d Cir.2000) (citations omitted) (emphasis added). In *Oran v. Stafford*, the Third Circuit further stated that "a District Court *may* deny leave to amend on the grounds that amendment would . . . be futile." 226 F.3d 275, 291 (3d. Cir.2000) (citing *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222

(1962)) (emphasis added). In light of these decisions, it is clear that this court was under no obligation to apply the futility standards in deciding whether to grant plaintiffs' motion for leave to amend their complaint.

The most applicable authority in deciding whether to grant leave to amend is the actual language of Fed.R.Civ.P. 15(a). The Rule states that "a party may amend the party's pleading . . . by leave of court . . . and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In granting leave for plaintiffs to file a second amended complaint, the court applied this standard alone, stating that "it is in the best interest of justice to permit plaintiffs to amend their class action complaint." The court was not required to and did not apply the futility standards to plaintiffs' proposed amendments. Thus, the court denies plaintiffs' motion to strike defendants' motion to dismiss.

### B. *Should the Court Grant Defendants' Motion to Dismiss?*

In defendants' motion to dismiss plaintiffs' Second Consolidated Amended Complaint, they argue that plaintiffs fail to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 9(b) and the heightened pleading standards of the PSLRA.

### 1. *Standard of Review*

■ Fed.R.Civ.P. 12(b)(6) requires a court to dismiss a complaint if it fails "to state a claim upon which relief can be granted." In assessing a motion to dismiss based on Fed.R.Civ.P. 12(b)(6), the court must construe the complaint in favor of the plaintiffs by accepting all material allegations of the complaint as true. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the

plaintiff's favor, no relief could be granted under any set of circumstances consistent with the allegations of the complaint." *Id.* A court may dismiss claims pursuant to Fed.R.Civ.P. 12(b)(6) only if the plaintiff cannot demonstrate any set of facts that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The general pleading requirements of Fed.R.Civ.P. 12(b)(6) are heightened in the present case through the application of Fed.R.Civ.P. 9(b) and the PSLRA. Fed. R.Civ.P. 9(b) requires plaintiffs to plead facts supporting alleged fraud with particularity and identify the speaker of allegedly fraudulent statements. *See Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 345 (3d Cir.1999). The PSLRA reinforced the elevated burden in 1995 by requiring that "if an allegation regarding [a misleading] statement or omission is made on information or belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C.A. § 78u–4(b)(1).[1] In order for plaintiffs' complaint to survive the motion to dismiss, the particular facts must then form the basis for a claim upon which relief may be granted. The court assesses the sufficiency of the Second Consolidated Amended Complaint in light of this standard.

**1.** 15 U.S.C.A. § 78u–4(b) provides:

(1) Misleading statements and omissions. In any private action arising under this chapter ... the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed

(2) Required state of mind. In any private action arising under this chapter in which the plaintiffs may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong

### 2. *Plaintiffs' Claims*

Count One of the Second Consolidated Amended Complaint alleges that defendants violated Section 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder by soliciting proxies under misleading pretenses.[2] Rule 14a–9 prohibits "solicitation ... by means of any proxy statement [or] form of proxy ... containing any statement which ... is false or misleading with respect to a material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...." In support of this claim, plaintiffs allege that during the proxy solicitation, defendants violated the disclosure requirements of SEC Schedule 13E, including Items 3(a) and 3(b) and Schedule 14A, and misstated or omitted material information relating to the Investor Group's intent to sell RCPI real estate to GE/NBC after the shareholders approved the merger. Plaintiffs further contend that they relied on defendants' omissions and misrepresentations in assessing the legitimacy of the merger, and that they suffered damages by selling their RCPI shares at an artificially deflated price.

Count Two of the Second Consolidated Amended Complaint alleges that defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.[3] Rule 10b–5 provides that

inference that the defendant acted with the required state of mind.

**2.** Section 14(a) of the Exchange Act states:

It shall be unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this Act.

15 U.S.C. § 78n.

**3.** Section 10(b) of the Exchange Act states as follows:

It shall be unlawful for any person ... [t]o use or employ, in connection with the pur-

"[i]t shall be unlawful for any person ... [t]o employ any device, scheme or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make that statement made ... not misleading. ..." In recognition of the scienter requirement of Section 10(b), plaintiffs specifically contend that defendants were aware of or recklessly blinded themselves to the Investor Group's pre-vote intention to sell RCPI real estate to GE/NBC. Defendants did not disclose any such intentions in the proxy statement, and as a result, plaintiffs allege that they relied upon a manipulative and deceptive device in deciding to approve the merger. Plaintiffs further allege that they suffered damages by selling their shares at an artificially deflated price.

Count Three of the Second Consolidated Amended Complaint alleges that defendants violated Section 20(a) of the Exchange Act. Section 20(a) provides that "[e]very person who ... controls any person liable ... shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not ... induce the act or acts constituting the violation. ..." 15 U.S.C. § 78t. Plaintiffs argue that defendants are liable controlling persons in that each defendant had the ability to control those responsible for drafting and issuing the materially misleading proxy statement. Plaintiffs refer to their prior allegations of damages in connection with this claim.

█ In order to be successful under any of the three counts, plaintiffs must demonstrate that defendants failed to disclose a material fact during the proxy solicitation. Plaintiffs claim pursuant to Rule 10b–5(a) requires a demonstration of materiality even though it is not expressly required in the language of the rule. *See In re Trump,*

7 F.3d at 368 (noting that claims of fraud require showing of materiality). A fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [proceed]." *Klein,* 186 F.3d at 344 (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Materiality is traditionally a question for the trier of fact. *Id.* at 342. Nevertheless, if "omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," a court may find them immaterial as a matter of law. *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 317 (3d Cir.1997). A court should find that an omission is immaterial as a matter of law when there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as insignificant to the total mix of information available to the investor. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281 n. 11 (3d Cir.1992).

The essence of plaintiffs' claims is that defendants failed to disclose a material fact during the proxy solicitation when they did not reveal that the Investor Group intended to sell certain RCPI real estate to GE/NBC. Pursuant to Fed. R.Civ.P. 9(a) and the PSLRA, plaintiffs must allege facts demonstrating defendants' failure with particularity. In an effort to satisfy this standard, plaintiffs set out statements that they argue demonstrate that prior to the shareholder vote, the Investor Group intended to sell the RCPI real estate to GE/NBC following the merger. Plaintiffs also set forth evidence of pre-vote sale negotiations as facts tending to show that the Investor Group had that intent.

█ Plaintiffs allege that Sheridan Scheckner of Goldman Sachs, Lawrence Rutkowsky of NBC, Charlie Schoenherr of GE Capital, Daniel Neidich, William Ja-

chase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as

necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

cobs and lawyers at Cahill, Gordon & Reindel, Sullivan & Cromwell and Schulte, Roth & Zabel engaged in sale negotiations at "various times in February and March" of 1996. Plaintiffs, however, fail to identify any statement or specific negotiations session relating to the sale. Such an allegation is not sufficiently particular under Fed.R.Civ.P. 9(b) or the PSLRA to show that prior to the shareholder vote, the Investor Group formed an intent to sell the RCPI real estate, and thus cannot support a claim upon which relief may be granted.

■ Plaintiffs also refer the court to a number of specific oral and written statements as factual bases for their claims. Many of the statements are documented in materials referenced in the Second Consolidated Amended Complaint. Ordinarily, "a district court ruling; on a motion to dismiss may not consider matters extraneous to the pleadings." *Burlington Coat Factory,* 114 F.3d at 1426. There is, however, an exception to the general rule, which allows the court to examine a document integral to or explicitly relied upon in the complaint without converting the motion to dismiss to a motion for summary judgment. *See id.* Thus, when a complaint refers to passages from certain extraneous documents, the court may consider the entire text of those documents. *See id.* ("[P]laintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them"). With this standard in mind, the court analyzes each statement and corresponding document relied upon by plaintiffs in turn.

### a. The Goldman Sachs Statements

■ In paragraph 68 of the Second Consolidated Amended Complaint, plaintiffs allege "Goldman Sachs suggested to GE/NBC that if GE/NBC was willing to pay upwards of $400 million for capital lease treatment, depreciation rights and a purchase option of ninety-three percent of fair market value in 2022, it should simply buy the space it leased at Rockefeller Center."

First, the court finds that this statement is not sufficiently specific to support plaintiffs' claim that defendants wrongfully failed to disclose that prior to the shareholder vote the Investor Group had formed an intent to sell the RCPI real estate to GE/NBC. The Third Circuit focused on the specificity requirements of Fed. R.Civ.P. 9(b) in *Klein,* where in connection with a public offering of stock, GNC shareholders alleged that "GNC's management" stated misleading sales statistics. *See* 186 F.3d at 345. The shareholders, however, failed to "attribute the statement to any specific member of GNC management." *Id.* In dismissing the shareholders' allegations pursuant to Fed.R.Civ.P. 9(b), the Third Circuit explained that one aspect of the requirements in the rule that a party plead the factual circumstances constituting the fraud with particularity, is that where a party identifies a statement as one of the circumstances constituting fraud, the party must identify in the pleading the speaker of that statement. *See id.* Plaintiffs have not done that in this case.

Second, the substance of the statement plaintiffs attribute to someone at Goldman Sachs suggests Goldman Sachs had considered a sale as an alternative to a lease, and had suggested GE/NBC consider that alternative, but it does not tend to establish that Goldman Sachs had advised the Investor Group to sell, nor does it tend to show that the Investor Group had formed an intent to sell rather than lease the property to GE/NBC. Consequently, this statement does not support plaintiffs' claim for relief.

Third, the statement tends to show that Goldman Sachs, the Investor Group and GE/NBC were aware that one available option would be a sale. The fact that they were aware of that option was not material information that needed to be disclosed to the shareholders, as no reasonable shareholder would have considered that information significant to the total mix of avail-

able information relating to the merger. Such a shareholder would have found the information insignificant because any sophisticated party negotiating a long-term commercial lease is aware that a sale is an alternative option. Thus, Goldman Sachs' recognition of the sale option was not unique.

In paragraph 84 of the Second Consolidated Amended Complaint, plaintiffs allege that on the evening of March 24, 1996, "Sheridan Scheckner, of Goldman Sachs, spoke with Charlie Schoenherr, of GE Capital, and Lawrence Rutkowsky, of NBC, and stated that an outright purchase of the leased property by GE/NBC would remove at least seven of the eleven open negotiating points between them." Plaintiffs further allege that "[t]he parties agreed to negotiate further, and scheduled a meeting for the following afternoon."

The court finds that these statements do not support plaintiffs' claim that defendants wrongfully failed to disclose that prior to the shareholder vote the Investor Group had formed an intent to sell the RCPI real estate to GE/NBC. As with the previous statement attributed to Goldman Sachs, the substance of these statements suggests Goldman Sachs had considered a sale as an alternative to a lease, and had suggested GE/NBC consider that alternative, but they do not tend to establish that Goldman Sachs had advised the Investor Group to sell, nor do they tend to show that the Investor Group had formed an intent to sell rather than lease the property to GE/NBC. As a result, these statements do not support plaintiffs' claim for relief.

Furthermore, as previously stated, the fact that Goldman Sachs, the Investor Group and GE/NBC were aware of sale option was not material information that needed to be disclosed to the shareholders, as no reasonable shareholder would have considered that information significant to the total mix of available information relating to the merger. A reasonable shareholder would have found the information

insignificant because any sophisticated party negotiating a long-term commercial lease is aware that a sale is an alternative option.

Finally, the fact that the parties agreed to continue negotiations does not tend to show that the Investor Group had formed a pre-vote intent to sell rather than lease the property to GE/NBC because the parties had been negotiating lease financing terms for some time. Plaintiffs allege no facts tending to show that the parties intended to continue sale negotiations on March 25, 1996 as opposed to lease financing negotiations. Therefore, the statement showing an intent to continue negotiations after the shareholder vote does not support plaintiffs' claim for relief.

### b. *The Wall Street Journal*

In paragraph 89 of the Second Consolidated Amended Complaint, plaintiffs argue that an article in the May 6, 1996 edition of *The Wall Street Journal* shows that the Investor Group and GE/NBC engaged in sale negotiations prior to the shareholder vote, and thus proves the Investor Group formed a pre-vote intent to sell the RCPI real estate. The article reports that "[o]ver the past two years, [GE/NBC] has been in discussions with nearly every party that stood a chance to gain control of the property." Mitchell Pacelle, *GE's NBC Paying $440 To Buy Rockefeller Center Offices,* The Wall Street Journal, May 6, 1996. The article goes on to quote Michael Sherlock, an Executive Vice President of NBC, as stating that "everything you can imagine was at one point, over the past year under negotiation." *Id.*

Plaintiffs fail to explain how the article tends to show that the Investor Group and GE/NBC were negotiating a sale prior to the shareholder vote. The article never specifically refers to the date of inception of sale negotiations. Moreover, the "past two years" and "past year" referred to by Pacelle and Sherlock include approximately forty days between the shareholder vote

and the actual sale during which the sale was certainly negotiated. Thus, neither statement tends to show that the inception of sale negotiations occurred before March 25, 1996, the day of the shareholder vote. As a result, the article does not make it more probable that the Investor Group and GE/NBC engaged in pre-vote sale negotiations, and thus, it does not support plaintiffs' claim that prior to the shareholder vote, the Investor Group formed an intent to sell the RCPI real estate to GE/NBC.

### c. *The New York Daily News*

In paragraph 89 of the Second Consolidated Amended Complaint, plaintiffs contend that an op-ed column in the June 6, 1996 edition of *The New York Daily News* shows that the Investor Group and GE/NBC were negotiating a sale in 1995, and thus proves the Investor Group formed a pre-vote intent to sell the RCPI real estate. In the column, Rick Cotton, another Executive Vice President of NBC, states:

> In 1995, a seismic event occurred: Rockefeller Center went bankrupt. NBC, in considering ways to provide for its long-term studio and office needs, had discussions with various investors to find a solution that would benefit Rockefeller Center, NBC and New York City.

> After examining many alternatives, NBC began to consider the possibility of purchasing our current space at Rockefeller Center.... This purchase would give the potential new owners of the Center $440 million in new, up-front capital....

Rick Cotton, *A Good Deal For The City*, The New York Daily News, June 6, 1996.

As with *The Wall Street Journal* article, plaintiffs fail to explain how the article tends to show that the Investor Group engaged in sale negotiations with GE/NBC prior to the shareholder vote. Cotton states that NBC had discussions with various investors as early as 1995, but he never elaborates on the specific nature of the discussions, nor does he mention the Investor Group in connection with the discussions. Furthermore, there is again a period of time between the shareholder vote and publication of the column during which the sale was certainly negotiated. Thus, the statement does not tend to show that the inception of sale negotiations occurred before the day of the shareholder vote, March 25, 1996. Therefore, the column does not make it more probable that the Investor Group and GE/NBC engaged in negotiations prior to the shareholder vote, and as such, it does not support plaintiffs' claim that the Investor Group formed a pre-vote intent to sell the RCPI real estate to GE/NBC.

### d. *The Letter of Intent*

In paragraphs 71 and 87 of the Second Consolidated Amended Complaint, plaintiffs argue that the April 25, 1996 Letter of Intent (the "Agreement") executed by RCPI Merger, Inc. and GE/NBC for the sale of twenty percent of Rockefeller Center acknowledges the Investor Group engaged in pre-vote sale negotiations with GE/NBC, and therefore proves that prior to the shareholder vote, the Investor Group formed an intent to sell the RCPI real estate. Plaintiffs first contend that because the Agreement refers to a draft letter of February 20, 1996 regarding GE/NBC's assumption of the heating and ventilation, elevator and window washing systems, the Investor Group must have engaged in sale negotiations with GE/NBC as early as February, 1996.

In describing the assumption of systems, however, the Agreement states that GE/NBC's assumption "shall be effective whether or not the proposed Transaction and Transfer [ (the sale) ] are consummated." It is clear from this statement that the assumption of services was not premised on any type of sale. With no connection between the assumption of services and the sale, the Agreement's reference to the February 20, 1996 letter does not tend to make it more probable that the Investor Group and GE/NBC were negotiating the sale in February, 1996, and as such, it does

not support plaintiffs' claim that the Investor Group formed a pre-vote intent to sell the RCPI real estate.

Plaintiffs next turn to a provision of the Agreement providing for "$440 million to be paid to the successor owner in the manner contemplated by the reorganization plan...." Plaintiffs focus on the word "contemplated" and argue that this provision shows that the Investor Group intended to sell the real estate as early as January 26, 1996, the date on which the partnerships submitted their plan of reorganization. After reviewing the Agreement, the court finds that plaintiffs have misinterpreted the provision. The word "contemplated" describes the manner of payment, not the payment itself. Plaintiffs' failure to identify any reference to the sale in the plan of reorganization further supports this interpretation. The court therefore concludes that the provision does not tend to make it more probable that the plan of reorganization specifically includes the sale, and as such, it does not support plaintiffs' claim that prior to the shareholder vote, the Investor Group formed a pre-vote intent to sell the RCPI real estate.

Finally, plaintiffs argue that the Agreement reveals the Investor Group's pre-vote intent in stating that "GE will submit the Proposed Transaction for the consideration of its Board of Directors no later than April 23, 1996" and "[i]t is expressly understood that certain Board members of GE have reviewed the Proposed Transaction prior to the execution of this Agreement." In both instances, the statement only supports the existence of sale negotiations prior to April 23, 1996, not March 25, 1996. Thus, the statements do not tend to make it more probable that the Investor Group and GE/NBC were engaged in pre-vote sale negotiations, and as such, they do not support plaintiffs' claim that prior to the shareholder vote, the Investor Group formed an intent to sell the RCPI real estate.

### e. *The Bankruptcy Hearings*

■ In paragraphs 90 through 94 of the Second Consolidated Amended Complaint, plaintiffs argue that certain statements made during a May 6, 1996 bankruptcy hearing show the Investor Group engaged in sale negotiations with GE/NBC prior to the shareholder vote, and therefore prove the Investor Group formed a pre-vote intent to sell the RCPI real estate. Plaintiffs initially identify a statement made by the partnerships' counsel describing the partnerships' second plan of reorganization. Their counsel stated:

There has been, as has been reported in the press, a significant development that in fact had been the topic of discussions for several weeks and that is the proposed transaction between the [RCPI] designee and NBC that will result in NBC acquiring substantially all of the space it presently leases in Rockefeller Center for a purchase price of some $440 million.

Plaintiffs contend that the "several weeks" of discussions concerning the sale of GE/NBC must have occurred, at least in part, before March 25, 1996. There were, however, approximately five weeks between March 25 and May 6 of 1996. Plaintiffs make no attempt to explain why the "several weeks" were not entirely contained within the five-week period between the shareholder vote and the bankruptcy hearing. Thus, the statement does not tend to make it more probable that the Investor Group and GE/NBC engaged in sale negotiations prior to the shareholder vote, and therefore, it does not support plaintiffs' claim that the Investor Group formed a pre-vote intent to sell the RCPI real estate.

Plaintiffs next turn to a statement made by counsel for Rockefeller Group, Inc. that "some time ago there had been some consideration of doing a transaction with GE and there were some other strings to that transaction that caused [Rockefeller Group, Inc.] and its shareholders to decide not to do the transaction." Plaintiffs note

that defendant David Rockefeller was at some point a principal of Rockefeller Group, Inc. Rockefeller Group, Inc., however, is not a defendant in this case, and there is no allegation that it was involved in the proxy solicitation. Furthermore, the fact that David Rockefeller was a principal of Rockefeller Group, Inc. does not transfer the disclosure obligations of Rockefeller Group, Inc. to defendants. Any discussions Rockefeller Group, Inc. may have had with GE/NBC do not tend to make it more probable that the Investor Group and GE/NBC were engaged in pre-vote sale negotiations. Thus, the discussions do not support plaintiffs' claim that prior to the shareholder vote, the Investor Group formed an intent to sell the RCPI real estate.

Plaintiffs next argue that the bankruptcy court recognized sale negotiations between Investor Group and GE/NBC prior to the shareholder vote when, in discussing the accuracy of a disclosure statement approved on February 8, 1996, it stated:

> The economics are so different now we ought to look at this from a different point of view. I need that representation because somebody is going to tell me disclosure statement was inadequate ... it never occurred to me that's what you were negotiating.... All I am saying to you is, it potentially gives rise to a question whether the disclosure statement might have been inadequate or inappropriate. What you are saying to me is that it doesn't fundamentally from your client's point of view change the transaction or the economics of the transaction in some way as to render the disclosure inappropriate, even though it did not disclose the possibility that the transaction would or could occur.

Plaintiffs contend that counsel's failure to deny that negotiations occurred further supports their existence. The court finds that plaintiffs take the statement out of context. Upon review of the entire transcript from the hearing, it is apparent that the transcript does not support plaintiffs'

contention that the bankruptcy court recognized sale negotiations between the Investor Group and GE/NBC in February, 1996. Rather, the bankruptcy court was attempting to determine whether negotiations between NBC and Rockefeller Group, Inc. should have been included in the partnerships' disclosure statement. For reasons previously stated, the existence of negotiations between Rockefeller Group, Inc. and NBC does not support plaintiffs' claim that the Investor Group formed a pre-vote intent to sell the RCPI real estate.

#### f. *The May 22, 1996 Letter*

In paragraph 96 of the Second Consolidated Amended Complaint, plaintiffs contend that a May 22, 1996 letter to the New York State Department of Law shows that the partnerships' plan of reorganization filed on February 8, 1996 specifically included the sale, and therefore proves the Investor Group formed a pre-vote intent to sell the RCPI real estate. In the letter, defendants represent that the "plan of reorganization contemplates that [the partnerships] shall transfer fee title to certain units (including its reversionary rights) to NBC, and transfer fee title to all remaining units owned by [the partnerships] to [RCPI]." In reviewing the entire letter, the court finds that plaintiffs have again taken a statement out of context.

The purpose of the letter was to persuade the New York State Department of Law that the sale to GE/NBC was within the class of transactions covered by the Department of Law's previously issued "no action letter." Defendants' wrote the letter two weeks after the proposed sale to GE/NBC was publicly announced and disclosed to the bankruptcy court. In stating that the plan of reorganization "contemplates" the "transfer," defendants were attempting to convey to the Department of Law that the sale did not contradict the provisions of the plan, and therefore did not require additional attention. Plaintiffs' failure to refer the court to any part of the

plan of reorganization that specifically refers to the sale to GE/NBC further supports this interpretation. Thus, the letter does not tend to make it more probable that the plan of reorganization specifically included the sale, and as such, it does not support plaintiffs' claim that prior to the shareholder vote, the Investor Group formed an intent to sell the RCPI real estate.

## IV. *SUMMARY AND CONCLUSION*

In summary, plaintiffs allege in their Second Consolidated Amended Complaint that prior to the March 25, 1996 vote approving the RCPI merger with the RCPI Merger, Inc., defendants wrongfully failed to disclose to RCPI's shareholders that the Investor Group had entered into negotiations to sell a portion of RCPI's real estate to GE/NBC. Defendants have moved to dismiss this complaint for failure to state a claim and have argued that plaintiffs have failed to identify the factual basis for these allegations with reasonable particularity.

On reviewing the allegations in the complaint, the court finds the plaintiffs have failed to identify facts that support their claims. Plaintiffs have identified certain statements they attribute to Goldman Sachs personnel where the possibility of a sale to GE/NBC was mentioned in conversations before the vote, but the statements are immaterial because no reasonable shareholder would have considered their content significant to the total mix of information available concerning the merger. Furthermore, the statements do not identify negotiations between the Investor Group and GE/NBC before the vote. Plaintiffs also point to press reports in *The Wall Street Journal* and *The New York Daily News* published after the vote that suggest GE/NBC had been considering buying the property for some time before the vote. Again, these facts do not identify sale negotiations or a failure to disclose a pre-vote intention to sell the RCPI real estate on the part of the Investor Group.

These facts and certain others identified by plaintiffs do not tend to show that the Investor Group engaged in pre-vote sale negotiations with GE/NBC. Nor do they tend to show that the Investor Group had formed an intent to sell a portion of the RCPI property to GE/NBC. Consequently, the facts are either immaterial or irrelevant and defendants have not, therefore, breached any duty owed to plaintiffs in failing to disclose them prior to the vote approving the merger.

For the reasons stated above, the court concludes that it was not required to, nor did it consider the pleading standards of Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 9(b) or the PSLRA in granting plaintiffs leave to amend the their First Consolidated Amended Complaint. Therefore, the court will deny plaintiffs' motion to. strike defendants' motion to dismiss. The court further concludes that plaintiffs have failed to allege a set of facts sufficient to satisfy the pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA. Thus, the court will grant defendants' motion to dismiss and dismiss all plaintiffs' claims.

The court will issue an order in accordance with this opinion.