

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-8-2002

# In Re Rockefeller

Precedential or Non-Precedential: Precedential

Docket No. 01-1755

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re Rockefeller " (2002). *2002 Decisions*. Paper 715.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/715

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 8, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 01-1755/1756

IN RE: ROCKEFELLER CENTER PROPERTIES, INC.
SECURITIES LITIGATION,

CHARAL INVESTMENT COMPANY INC., a New
Jersey Corporation; C.W. SOMMER & CO., a Texas
Partnership, on behalf of themselves and all others
similarly situated; ALAN FREED; JERRY CRANCE;
HELEN SCOZZANICH; SHELDON P.
LANGENDORF; RITA WALFIELD; ROBERT
FLASHMAN; RENEE B. FISHER FOUNDATION
INC.; FRANK DEBORA; WILSON WHITE;
STANLEY LLOYD KAUFMAN, JR.; JOSEPH GROSS

v.

DAVID ROCKEFELLER; GOLDMAN SACHS
MORTGAGE CO.; GOLDMAN SACHS GROUP
LP; GOLDMAN SACHS & CO.; WHITEHALL
STREET REAL ESTATE LIMITED
PARTNERSHIP V; WH ADVISORS INC. V;
WH ADVISORS LP V; DANIEL M. NEIDICH;
PETER D. LINNEMAN; RICHARD M. SCARLATA

Frank Debora; Wilson White; Stanley
Lloyd Kaufman, Jr.; Joseph Gross,
Appellants No. 01-1755

CHARAL INVESTMENT COMPANY INC., a New
Jersey Corporation; C.W. SOMMER & CO., a Texas
Partnership, on behalf of themselves and all others
similarly situated; ALAN FREED; JERRY CRANCE;

HELEN SCOZZANICH; SHELDON P.
LANGENDORF; RITA WALFIELD; ROBERT
FLASHMAN; RENEE B. FISHER FOUNDATION
INC.; FRANK DEBORA; WILSON WHITE;
STANLEY LLOYD KAUFMAN, JR.; JOSEPH GROSS

v.

DAVID ROCKEFELLER; GOLDMAN SACHS
MORTGAGE CO.; GOLDMAN SACHS GROUP
LP; GOLDMAN SACHS & CO.; WHITEHALL
STREET REAL ESTATE LIMITED
PARTNERSHIP V; WH ADVISORS INC. V;
WH ADVISORS LP V; DANIEL M. NEIDICH;
PETER D. LINNEMAN; RICHARD M. SCARLATA

Charal Investment Company Inc.; C.W. Sommer
& Co.; Renee B. Fisher Foundation; Helen
Scozzanich; Jerry Crance; Alan Freed; Sheldon P.
Langendorf; Rita Walfield; Robert Flashman,
Appellants No. 01-1756

On Appeal from the Order of the
United States District Court
for the District of Delaware
(D.C. Civ. No: 96-543 (RRM))

District Court Judge: The Honorable Roderick M. McKelvie

Argued on January 17, 2002

Before: RENDELL, FUENTES, and MAGILL,*
Circuit Judges

(Opinion Filed: November 8, 2002)

_____

* The Honorable Frank J. Magill, United States Circuit Judge for the
Eighth Circuit, sitting by designation.

Michael D. Donovan (argued)
Donovan Searles, LLC
1608 Walnut Street
Suite 1400
Philadelphia, PA 19103

 Attorney for Appellants

Pamela S. Tikellis
Chimicles & Tikellis, LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

 Attorney for Appellants

James R. Malone, Jr.
Chimicles & Tikellis, LLP
361 West Lancaster Avenue
One Haverford Center
Haverford, PA 19041

 Attorney for Appellants

Ann Miller
Suite 206, The Benjamin Franklin
 House
834 Chestnut Street
Philadelphia, PA 19107

 Attorney for Appellants

Max Gitter (argued)

Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, New York 10006

 Attorney for Appellees
Goldman Sachs Mortgage Co.,
Goldman Sachs Group LP,
Goldman Sachs & Co., Whitehall
Street Real Estate Limited
Partnership V, WH Advisors, Inc.,
WH Advisors LP V, and Daniel M.
Neidich

3

Richard A. Rosen
Robert N. Kravitz
Paul, Weiss, Rifkind, Wharton &
 Garrison
1285 Avenue of the Americas
New York, New York 10019

 Attorneys for Appellees
Goldman Sachs Mortgage Co.,
Goldman Sachs Group LP,
Goldman Sachs & Co., Whitehall
Street Real Estate Limited
Partnership V, WH Advisors, Inc.,
WH Advisors LP V, and Daniel M.
Neidich

Robert K. Payson
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19899

 Attorney for Appellees
Peter D. Linneman and
Richard M. Scarlata

Russell E. Brooks
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, New York 10005

 Attorney for Appellee
David Rockefeller

Richard D. Allen
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

 Attorney for Appellee
David Rockefeller

4

OPINION OF THE COURT

FUENTES, Circuit Judge:

This appeal marks the second time that we address the underlying dispute between the parties. The controversy relates to the landmark Rockefeller Center in midtown Manhattan and arises out of the proxy solicitation in connection with the acquisition of Rockefeller Center Properties, Inc. ("RCPI") by a consortium of investors, including David Rockefeller, Whitehall Street Real Estate Limited Partnership V ("Whitehall") and its affiliates, various divisions of the Goldman Sachs Group, Inc. ("Goldman Sachs"), and three individuals associated with those entities.1 The proxy statement painted a bleak financial picture of Rockefeller Center and included management's recommendation to approve the merger. One month after the shareholders of RCPI voted to approve the merger, the new owners of Rockefeller Center, the Investor Group, sold approximately 20% of the property to the National Broadcasting Company and its parent, the General Electric Company ("GE/NBC"), for $440 million.

Plaintiffs, the shareholders of RCPI (the "Shareholders"), contend that the Investor Group fraudulently omitted from the proxy statement and other supporting materials the fact that RCPI had been negotiating the sale with GE/NBC prior to the proxy vote and that RCPI had formed an intent to consummate the sale during those pre-vote negotiations, thereby running afoul of the federal securities laws. As a result of the allegedly fraudulent omissions, the Shareholders contend that they were deceived into relinquishing their ownership rights and that they could

_____

1. Collectively, the consortium of investors is referred to as the "Investor Group." The individual defendants include: Daniel M. Neidich ("Neidich"), a former director of RCPI and affiliated with Goldman Sachs and Whitehall during the relevant time period; Peter D. Linneman ("Linneman"), a former Chairman of RCPI's Board and Consultant to Goldman Sachs; and Richard M. Scarlata ("Scarlata"), a former President and Chief Executive Officer of RCPI and consultant to the acquiring investors.

have realized more value from their investments. The Investor Group moved to dismiss the Shareholders' Second Consolidated Amended Class Action Complaint ("Second Amended Complaint"). The District Court granted the motion and dismissed the Second Amended Complaint. The matter comes before us on the Shareholders' appeal of the dismissal.

We agree with the District Court insofar as it held that the Shareholders had failed to meet the heightened pleading requirements of securities fraud actions set forth

in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 2 15 U.S.C. S 78u-4(b)(1) (the "Reform Act"). Accordingly, we affirm the judgment of the District Court.

I.

Although prior decisions have set forth the facts of this case in some detail, the present appeal arises out of the Shareholders' Second Amended Complaint which contains several new allegations not before the Court in its prior ruling. See, e.g., In re Rockefeller Center Properties, Inc. Securities Litigation, 184 F.3d 280 (3d Cir. 1999); Charal Investment Co., Inc. v. Rockefeller, 131 F. Supp. 2d 593 (D. Del. 2001). Therefore, we review the factual background, accepting the well-pleaded allegations in the Second Amended Complaint as true and considering the documents incorporated by reference therein. See In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1420, 1426 (3d Cir. 1997) ("A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. . . . [A] 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' ") (citations omitted).

---

2. P.L. No. 104-67, 109 Stat. 737 (1995).

A.

Rockefeller Center (or the "Property") is comprised of several commercial and retail buildings in a large midtown Manhattan complex. The Shareholders contend that the Rockefeller family exercised ownership and control over the Property through a network of related entities. Second Amended Complaint, at P 28. Prior to 1996, the Rockefeller Group, Inc. ("RGI") owned the Property through its control over two partnerships, Rockefeller Center Properties and RCP Associates (the "Partnerships").3 RCPI was a real estate investment trust ("REIT") created in 1985 for the purpose of funding the Partnerships with a $1.3 billion loan. RCPI obtained the funds for the loan through an initial public offering of 37.5 million shares at a price of $20 per share, resulting in proceeds of $750 million. The remainder of the funds came from two offerings of convertible debentures. RCPI secured its $1.3 billion loan by receiving two mortgages on the Property.

Despite the substantial capitalization in 1985, Rockefeller Center, RCPI, and the Partnerships soon confronted mounting financial difficulties.4 By the Fall of 1994, RCPI realized that it would be unable to honor upcoming debenture payments without additional financing. To avoid default, RCPI turned to Goldman Sachs and Whitehall for

an additional cash infusion of $225 million.5 Under the

_____

3. Co-defendant David Rockefeller was simultaneously Chairman of RCPI and principal of the Rockefeller Group, Inc.

4. The parties are at odds over the reasons for RCPI's financial troubles. The Shareholders contend that the problems were self-inflicted, that RCPI incurred substantial short-term debt backed by letters of credit in order to retire the REIT's long-term debt from the convertible debentures. The scheme allegedly failed because RCPI did not have sufficient means to meet the short-term debt obligations. In contrast, the Investor Group attributes RCPI's financial problems not to mismanagement, but rather to the well-documented downturn in New York's commercial real estate market in the late 1980s and early 1990s.

5. Although in prior filings and proceedings the Shareholders included Whitehall among the lenders in 1994, the Second Amended Complaint attributes all $225 million of the financing to Goldman Sachs alone. Compare Plaintiffs' First Consolidated Amended Class Action Complaint,

7

terms of the financing, Goldman Sachs agreed to loan $150 million to RCPI, and Whitehall provided for the issuance of $75 million more in debentures. In return, both Goldman Sachs and Whitehall obtained equity interests in RCPI by partial assignments of the Rockefeller Center mortgage, and Goldman Sachs received a seat on RCPI's Board of Directors.6

The Shareholders assert that several aspects of the 1994 financing agreement made it disadvantageous for RCPI. First, the financing included a "cash-sweep" provision requiring RCPI to pay directly to Goldman Sachs any funds falling within the definition of "excess" cash. Id., at P 31. According to the Shareholders, the cash-sweep provision further jeopardized the liquidity of RCPI. Id . Because the cash-sweep provision required "mandatory prepayment from RCPI's net cash flow," the proceeds from any subsequent sale of equity or assets of RCPI would be applied first to pay down the REIT's outstanding debt to Goldman Sachs. Id. at P 33.7

In addition, the agreement contained an anti-dilution provision intended to protect Goldman Sachs' equity interest. The anti-dilution provision meant that any subsequent bidder competing with Goldman Sachs for an

_____

at PP 40-42 and In re Rockefeller, 184 F.3d at 283 with Second Amended Complaint, at PP 30-33. Nevertheless, RCPI's Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on December 18, 1994, reflects financing from both Goldman Sachs and Whitehall, as well as other entities. Because RCPI's 1994 Form 8-K is incorporated in the parties' joint appendix, we reiterate the Court's prior factual finding relating to the involvement of both Whitehall and Goldman Sachs in the 1994 financing. See In re Rockefeller, 184 F.3d at 283.

6. Co-defendant Neidich occupied Goldman Sachs' seat on RCPI's Board of Directors.

7. The Investor Group points out that limitations on the subsequent sale of RCPI's equity or assets were even more prohibitive than the Shareholders allege. It notes that covenants on the debentures provided for in the 1994 financing explicitly prohibited RCPI itself from prepaying the debt for five years. Therefore, RCPI could not itself sell any assets to GE/NBC or anyone else during this restricted period without violating this pre-payment restriction. See Appellees' Brief, at 4.

outright purchase of RCPI would have to exceed Goldman Sachs' own bid by over $1.00 per share. Id. at P 32.

RCPI's financial problems did not end with the additional cash infusion of $225 million in late 1994. In particular, the Partnerships continued to experience severe cash flow difficulties. On May 11, 1995, the Partnerships suspended all interest payments due on the mortgage loan to RCPI and filed petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. In turn, RCPI came to the realization that it would not be able honor its own obligations under the debentures without the interest payments from the Partnerships, which led it to consider a number of recapitalization alternatives.

RCPI's exploration of financing alternatives triggered a bidding war that resulted in various types of recapitalization proposals from many different bidders. As this Court noted previously, three groups emerged from the pack of bidders with the most promising proposals. See In re Rockefeller, 184 F.3d at 283. One group was led by Samuel Zell, a real estate investor based in Chicago, and included GE/NBC who, at that time, was a tenant of approximately 20% of the Property (the "Zell Group"). Another group was led by Gotham Partners, L.P., who already held 5.6% of RCPI's outstanding shares. Third, the Investor Group entered the mix as a bidder.

In the initial stages of the bidding, the Zell Group arguably established an early lead. On August 16, 1995, RCPI entered into an agreement with the Zell Group evidenced by a letter of intent, which provided an immediate $10 million loan to enable RCPI to meet its upcoming obligations to Goldman Sachs.8  The letter of intent paved the way for a more formal combination agreement between the Zell Group and RCPI on September 11, 1995. The Zell Group proposed a $250 million capital contribution to acquire a 50% equity interest in a new

_____

8. Although the precise dates of the various proposals submitted by the bidders differ in this Court's prior ruling, see In re Rockefeller, 184 F.3d at 283, and in the District Court's decision, Rockefeller, 131 F. Supp. 2d at 596-97, we view the Shareholders' most recent allegations in the Second Amended Complaint as controlling here.

entity that would purchase the existing assets of RCPI. The remaining 50% interest in the entity would be reserved for RCPI's shareholders. The Zell Group plan also contemplated refinancing $700 million of RCPI's outstanding debt. The agreement did not preclude RCPI from terminating the combination agreement in favor of a superior proposal.

As the bidding commenced, the Partnerships filed a proposed plan of reorganization with the bankruptcy court on September 12, 1995, in which they agreed to relinquish ownership of Rockefeller Center to RCPI. Second Amended Complaint, at P 45. Thereafter, the bidding for RCPI steadily escalated. The intensity was marked by increasing offers for the purchase of all outstanding shares of RCPI, in conjunction with various debt refinancing plans or rights offerings.[9] On October 1, 1995, Goldman Sachs and the Investor Group offered to acquire all of the outstanding shares of RCPI for $7.75 per share in cash. According to the Shareholders, the "offer was fundamentally different from all the prior recapitalization proposals, as the shareholders would no longer have a continuing equity interest in the REIT. In connection with the offer, the Investor Group stated it would capitalize the acquiring entity with equity of 440 million dollars." Id. at P 50.

Throughout the course of bidding, RCPI's Board communicated with prospective bidders as it evaluated incoming proposals. For instance, on September 18, 1995, when asked if it had any plans to sell any or all twelve of the buildings at Rockefeller Center, Goldman Sachs responded that, "NO, [GOLDMAN SACHS] DOES NOT HAVE ANY SUCH PLAN." Id. at P 46 (emphasis in original).

On October 5, 1995, the Zell Group enhanced its recapitalization proposal by reducing the size of its proposed ownership of the new entity, increasing the rights offering to RCPI's shareholders, and agreeing to pay $33 million directly to Goldman Sachs for its consent to the

---

9. As we noted in In re Rockefeller, a rights offering would have provided RCPI's existing shareholders an opportunity to participate in a new offering of shares, possibly at a discount to the market price of the newly-issued shares. 184 F.3d at 283 n.4 (citing JAMES D. COX ET AL., SECURITIES REGULATION 217 (2d ed. 1997)).

plan. According to the Shareholders, the RCPI Board never responded to this enhanced proposal. Allegedly hamstrung by the anti-dilution provisions of the 1994 Goldman Sachs-led financing, the Zell Group made one final proposal on October 27, 1995: an offer of $1.16 billion, mostly in cash, to buy the mortgage loan from RCPI. The Zell Group estimated that its final proposal would amount to buying out RCPI's shareholders at a price between $7.49 and

$9.00 per share, "depending upon the outcome of negotiations or litigation with Goldman Sachs relating to various terms and conditions of the 1994 Goldman Sachs Financing." Id. at P 54. Once again, the Shareholders contend that RCPI never responded to the Zell Group's bid.

Finally, on November 7, 1995, RCPI's Board of Directors agreed to a cash-out merger with the Investor Group in which all of RCPI's outstanding shares would be acquired for a price of $8.00 per share.10 In light of its determination that the Investor Group's bid was financially superior to the other offers, RCPI's board terminated the combination agreement with the Zell Group. The cash-out merger with the Investor Group was contingent on the approval of RCPI's Shareholders, and the agreement provided that in the event of rejection by the Shareholders, RCPI could elect to make a $200 million rights offering to its Shareholders at a price not less than $6 per share (the "Rights Offering").

RCPI filed a preliminary proxy statement with the SEC in December 1995. On February 14, 1996, RCPI filed its final proxy statement and distributed it to the Shareholders along with the company's letter and notice of special meeting to vote on the Investor Group's proposal. The letter to the Shareholders was signed by co-defendants Linneman, Chairman of RCPI's Board, and Scarlata, President and CEO of RCPI.

The Shareholders contend that several aspects of the proxy statement were misleading in varying degrees. First, the board emphasized that it "has unanimously approved the Merger Agreement, has determined that the Merger

_____

10. The Investor Group's $8.00 per share bid represented a premium of approximately 50% over the price of RCPI stock before the bidding commenced. See In re Rockefeller, 184 F.3d at 283.

11

Agreement is fair to and in the best interests of RCPI and its stockholders and recommends that you vote FOR approval and adoption of the Merger Agreement. " App. at A00457 (emphasis in original). RCPI's assessment of fairness and its recommendation of approval were echoed in an opinion letter from PaineWebber, Inc. attached to the proxy statement. See id. at A00619.

Second, the proxy statement painted an unmistakably bleak financial picture for RCPI. In RCPI's discussion of the "Background of the Merger," id. at A00485, the company detailed the late 1980s, early 1990s downturn in the commercial real estate market, the liquidity problems of RCPI, and the bankruptcies of the Partnerships. In the section entitled "Recommendation of the Board," the proxy statement explicitly set forth the risk of RCPI's own bankruptcy in the event that recapitalization was not forthcoming. Id. at A00511. In this regard, it is worth noting that the Board's recommendation characterized the

Zell Group and Gotham's proposals as carrying "substantial risk that the consummation of [the proposals] might not occur or might be significantly delayed as a result of legal challenges brought by the Whitehall Group." Id. at A00510. The proxy statement also detailed the risks to the Shareholders in the event that they retained an interest in RCPI, "including the dependence on a single asset, the continued significant cash flow deficits expected to be generated by the Property and the highly leveraged condition of RCPI or its successor at least in the years immediately following such transaction." Id. at A00512.

Third, as to the Rights Offering, in the event that the Shareholders rejected the Investor Group's proposal, the proxy statement cautioned the Shareholders against any undue reliance on it. If the Shareholders rejected the Investor Group's bid, any alternative including the Rights Offering "might require either the Whitehall Group's consent, potentially protracted litigation or the commencement of a Chapter 11 case by RCPI." Id. at A00473. Furthermore, the company warned that "if RCPI's stockholders do not approve the Merger Agreement, RCPI could be subject to substantial uncertainties." Id.

12

Fourth, the Shareholders aver that RCPI misleadingly characterized the Investor Group's post-acquisition plans for the new entity: "The Investors currently intend that, following the Merger, at least $430 million in new debt financing would be raised and that a portion of the proceeds thereof would be used to repay the indebtedness outstanding under the Floating Rate Notes and the Current Coupon Convertible Debentures. . . . The Investors expect that Newco will own and operate the Property consistently with past practices but may increase expenditures and make such other changes as deemed appropriate by the Investors." Id. at 00522. Although these statements tend to imply that the Investor Group's post-acquisition plans contemplated "new debt financing" in accordance with "past practices," the same section of the proxy statement expressly hedged that contemplation: "The Investors' financing plans may change in light of changes in market conditions and other considerations."

Fifth, the Shareholders contend that the proxy statement contained misleading estimates of the value of Rockefeller Center. In its opinion letter, PaineWebber noted that it did not conduct an independent appraisal of the Property, relying instead on one performed by Douglas Elliman in 1994. That appraisal valued the Rockefeller Center complex at $1.25 billion. Plaintiffs contend, however, that the proxy statement omitted the appraisal's observation that Rockefeller Center would likely be worth more if divided and sold as separate pieces and that analysts had expected the commercial real estate market to rebound in 1995.

Finally, the proxy statement contained several statements describing the relationship between GE/NBC and RCPI. At

the time, NBC was leasing approximately 20% of Rockefeller
Center to house its offices and broadcast studios. See
Rockefeller, 131 F. Supp. 2d at 598. The proxy statement
described a transaction in September 1995 in which NBC's
lease was modified to add a guarantee on the lease by GE,
so that RCPI could obtain "lease financing." 11 RCPI

---

11. In In re Rockefeller, we noted that"credit lease financing is a form of
asset securitization in which the right to receive future lease payments
is sold for the present value of those payments." 184 F.3d at 284 n.6
(citing RICHARD R. GOLDBERG, "Commercial Real Estate Securitization:
Capital Markets Financing for Debt and Equity," 2MODERN REAL ESTATE
TRANSACTIONS 1745 (11th ed.)).

13

disclosed this transaction on its January 26, 1996
Schedule 13E-3 filing with the SEC. In addition, the proxy
statement revealed that if the proposed acquisition by the
Investor Group failed, RCPI would entertain the possibility
of a credit lease financing arrangement with GE. GE's role
in the background of events was also mentioned in
connection with its participation in the Zell Group.
According to the Shareholders, these statements were
misleading and incomplete in that they failed to disclose
alleged negotiations between the REIT and GE/NBC
relating to the outright purchase of its corporate office
space from RCPI.

After reviewing the proxy materials, the Shareholders
approved the Investor Group's bid to acquire RCPI on
March 25, 1996. About a month later, on April 23, 1996,
the Investor Group formally entered into an agreement with
GE/NBC for the sale of that portion of Rockefeller Center
already occupied by GE/NBC in return for $440 million.
According to the Shareholders, it was not until RCPI's April
25, 1996 Amendment to its Schedule 13-D filing with the
SEC that it disclosed the sale to GE/NBC.

B.

In their Second Amended Complaint, the Shareholders
allege three separate violations of the federal securities law.
Count One of the Second Amended Complaint alleges that
the Investor Group violated Section 14(a) of the Securities
Exchange Act, 15 U.S.C. S 78n(a), and Rule 14a-9
promulgated thereunder, 17 C.F.R. S 240.14a-9. In
pertinent part, Section 14(a) states:

> It shall be unlawful for any person . . . in contravention
> of such rules and regulations as the Commission may
> prescribe as necessary or appropriate in the public
> interest or for the protection of investors, to solicit . . .
> any proxy or consent or authorization in respect of any
> security (other than an exempted security) registered
> pursuant to Section 78l of this Act.

Rule 14a-9 accordingly prohibits "solicitation . . . by means

of any proxy statement [or] form of proxy . . . containing
any statement which, at the time and in the light of the

14

circumstances under which it is made, is false or
misleading with respect to any material fact, or which omits
to state any material fact necessary in order to make the
statements therein not false or misleading . . . ."

Count Two of the Second Amended Complaint alleges
that the Investor Group violated Section 10(b) of the
Securities Exchange Act, 15 U.S.C. S 78j(b), and Rule 10b-
5 promulgated thereunder, 17 C.F.R. S 240.10b-5. Section
10(b) states:

> It shall be unlawful for any person . . . [t]o use or
> employ, in connection with the purchase or sale of any
> security . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and
> regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for
> the protection of investors.

Rule 10b-5(b) clarifies that "[i]t shall be unlawful for any
person . . . [t]o make any untrue statement of a material
fact or to omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not misleading
. . . ." The Shareholders' claim under Rule 10b-5 alleges not
only misrepresentations and omissions, but also the
Investor Group's failure to update information that became
misleading in light of the alleged negotiations between RCPI
and NBC/GE.

Count Three of the Second Amended Complaint alleges
that certain individual defendants violated Section 20(a) of
the Securities Exchange Act, 15 U.S.C. S 78t, which
provides that "[e]very person who . . . controls any person
liable under any provision of this chapter or of any rule or
regulation thereunder shall also be liable jointly and
severally with and to the same extent as such controlled
person . . . unless the controlling person acted in good faith
and did not directly or indirectly induce the act or acts
constituting the violation or cause of action."

At the pleading stage, the elements necessary to allege a
violation pursuant to each of the three statutes differ in
some respects. For instance, we have held that in order to
state a violation under Rule 10b-5, plaintiffs must allege

15

that defendants acted with the requisite state of mind. See
In re Westinghouse Securities Litigation, 90 F.3d 696, 710
(3d Cir. 1996); In re Burlington, 114 F.3d at 1417. Scienter
is not, however, a necessary element in alleging a Section
14(a) claim. See General Electric Co. by Levit v. Cathcart,

980 F.2d 927, 932 (3d Cir. 1992); In re NAHC, Inc. Securities Litigation, No. 01-4132, 2002 WL 31194316, *11 (3d Cir. Oct. 3, 2002). Both statutes explicitly require a well-pleaded allegation that the purported misrepresentations or omissions at issue were material. See In re Rockefeller, 184 F.3d at 289-90. As to the Shareholders' claim pursuant to Section 20(a), it is well-settled that controlling person liability is premised on an independent violation of the federal securities laws. See Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir. 1992) (" 'controlling person' liability can exist only if primary liability has been established as to another defendant. . . . Here, the dismissal of the § 10(b) claims against UJB made it impossible to hold the individual defendants liable under § 20(a)."). As such, derivative claims under Section 20(a) depend on "proof of a separate underlying violation of the Exchange Act." In re Nice Systems, Ltd. Securities Litigation, 135 F. Supp. 2d 551, 588 (D.N.J. 2001) (citations omitted).

Notwithstanding these differences in the essential elements of the three statutory claims brought by the Shareholders, all three sound in fraud and require, therefore, well-pleaded allegations of fraudulent misrepresentations or omissions as the case may be. See In re Burlington, 114 F.3d at 1417 ("The first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."); In re Westinghouse, 90 F.3d at 707 ("Plaintiffs' claims under section 10(b) of the Exchange Act and under sections 11 and 12(2) of the Securities Act all require among other things, that plaintiffs allege a material misstatement or omission.") (emphasis in original).

The linchpin of the Shareholders' action -- the core theory of fraud at issue in all three of their claims -- is their allegation that members of the Investor Group had

16

engaged in negotiations with GE/NBC regarding a sale of the space occupied by NBC and that the Investor Group had, in fact, formed an intent to sell a portion of Rockefeller Center to GE/NBC prior to the Shareholders' vote. The Shareholders allege that these critical omissions from the proxy statement were misleading in and of themselves, which, in turn, rendered other affirmative representations fraudulent. Thus, the Shareholders must, at a minimum, present well-pleaded allegations supporting their theory of fraud in order to survive a motion to dismiss.

In that regard, the Shareholders identify seven distinct events that they contend properly substantiate their claim that the Investor Group had engaged in sale negotiations with GE/NBC and had, in fact, formed an intent to sell to GE/NBC, 20% of Rockefeller Center:

(1) Around February 1996, the Shareholders claim

that "Goldman Sachs suggested to GE/NBC that if GE/NBC was willing to pay upwards of 400 million dollars for capital lease treatment, depreciation rights and a purchase option of 93 percent of fair market value in 2022, it should simply buy the space it leased at Rockefeller Center." Second Amended Complaint, at P 68. The Shareholders assert that the purported negotiations for the sale of this portion of the Rockefeller Center continued throughout February and March 1996.

(2) On March 24, 1996, the evening before the proxy vote, the Shareholders allege that "Sheridan Sheckner, of Goldman Sachs, spoke with Charlie Schoenherr, of GE Capital, and Lawrence Rutkowsky, of NBC, and stated that an outright purchase of the leased property by GE/NBC would remove at least seven of the eleven open negotiating points between them. The parties agreed to negotiate further, and scheduled a meeting for the following afternoon!" Id. at P 84.

(3) The Shareholders also contend that a Wall Street Journal article (the "WSJ Article") published after the sale to GE/NBC supports their claims of fraud. The May 6, 1996 article "reported that over the

17

past two years GE and NBC had been in discussions with every party that had had an opportunity to gain control of the Property, and that they began negotiating with defendants Rockefeller and Goldman Sachs in November 1995. The article quoted Michael Sherlock, an Executive Vice President of NBC, as stating 'everything you can imagine was at one point, over the past year, under negotiation.' " Id. at P 89.

(4) Similarly, the Shareholders point to a June 6, 1996 New York Daily News article (the "NY Daily News Article") written by Rich Cotton, another Executive Vice President of NBC, stating that "NBC had explored the transaction since 1995 and that '[t]his purchase would give the potential new owners of the center $440 million in new up-front capital.' " Id. at P 89.

(5) The Shareholders also assert that a February 20, 1996 draft letter agreement between the Partnerships and GE/NBC, when read together with the April 23, 1996 sale agreement between the Investor Group and GE/NBC, substantiates the fraudulent omissions and misrepresentations they allege. Id. at PP 71, 87. The February 20, 1996 draft letter was allegedly transmitted by the Partnerships, at the behest of Goldman Sachs, and permitted GE/NBC to assume control of certain systems at Rockefeller Center, including the

heating, ventilation, air conditioning, elevator, and window washing systems. The April 23, 1996 sale agreement, specifically refers to the earlier draft letter, from which the Shareholders deduce that sale negotiations must have taken place before the proxy vote.

(6) The Shareholders also contend that several statements made during bankruptcy proceedings relating to the Partnerships establish that sale negotiations between the Investor Group and GE/NBC had been underway before the proxy vote. At a May 6, 1996 hearing, the Shareholders allege that counsel for the Partnerships stated:

18

"There has been, as has been reported in the press, a significant development that in fact had been the topic of discussions for several weeks and that is the proposed transaction between the REIT designee and NBC that will result in NBC acquiring substantially all of the space that it presently leases in Rockefeller Center for a purchase price of some $440 million." Id. at P 90. Furthermore, counsel for RGI acknowledged that "some time ago there had been some consideration of doing a transaction with G.E. and there were other strings to that transaction that caused [RGI] and its shareholders to decide not to do the transaction." Id. at P 91.12

(7) Finally, the Shareholders contend that in a May 22, 1996 letter to the New York State Department of Law, "the Investor Group represented that the February 8, 1996 'plan of reorganization contemplates that RCPA [the Partnerships] shall transfer fee title to certain units (including its reversionary rights) to NBC, and transfer fee title to all remaining units then owned by RCPA to [RCPI] . . . ." Id. at P 96 (emphasis in original).

---

12. In addition, the Shareholders assert that the bankruptcy court's own observations about the disclosure of the sale support their claims. The court noted that:

The economics are different now we ought to look at this from a different point of view. I need that representation because somebody is going to tell me the disclosure statement was inadequate. This transaction, maybe I am just the naive one, it never occurred to me that's what it was you were negotiating. So I am saying to you, I may be the only one that wasn't . . .

All I am saying to you is, it potentially gives rise to a question whether the disclosure statement in some way might have been inadequate or inappropriate. What you are saying to me is that it doesn't fundamentally from your client's point of view change the transaction or the economics of the transaction in some way as to

render the disclosure inappropriate, even though it did not disclose the possibility that this transaction would or could occur.

Id. at P 92.

C.

As noted earlier, this appeal marks the second time that this Court has addressed the Shareholders' action. In our first encounter, the Shareholders appealed the dismissal of their First Consolidated Amended Class Action Complaint. The District Court had converted the Investor Group's motion to dismiss into one for summary judgment and ruled, in separate decisions, on the two claims then before it. Specifically, as to the sale negotiations claim, the District Court found that the Shareholders had failed to offer any proof that defendants knew of the details of the sale to GE/NBC at the time of the proxy statement or the Shareholders vote, or that the information would have been material to a reasonable investor. See In re Rockefeller, 184 F.3d at 285. Furthermore, as to the Shareholders' claim that the Investor Group had omitted information about the existence of "air rights," the District Court also found those omissions to be immaterial. Id. at 286. At that time, this Court affirmed the grant of summary judgment on the air rights claim, but held that the District Court had improperly converted the motion to dismiss the sale negotiations claim into one for summary judgment. Accordingly, the Court vacated and remanded the case. The Court also noted that the parties had briefed and argued their positions prior to the Court's recent decision in In re Advanta Corporation Securities Litigation, 180 F.3d 525 (3d Cir. 1999). Therefore, the Court remanded the case to afford the parties an opportunity to consider the impact of In re Advanta.

On remand, the District Court granted the Shareholders' motion for leave to file the Second Amended Complaint. See Rockefeller, 131 F. Supp. 2d at 599. The Second Amended Complaint focused on the Shareholders' allegation pertaining to the sale negotiations, but also added a number of factual allegations and the claim under Section 20(a) of the Securities Exchange Act. Shortly thereafter, the Investor Group moved to dismiss the Second Amended Complaint. The Shareholders responded by filing a motion to strike the Investor Group's motion contending that the District Court had already considered the "futility standards" when ruling on their motion to amend the First

Amended Complaint. Therefore, the Shareholders argued that the District Court had implicitly determined that the Second Amended Complaint satisfied the heightened pleading requirements of Rule 9(b) and the Reform Act.

The District Court addressed both of the motions before it on March 12, 2001. First, the court held that in considering the Shareholders' motion for leave to amend, it relied principally on Rule 15(a) of the Federal Rules of Civil Procedure, which counsels that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); Rockefeller, 131 F. Supp. 2d at 601. Since it had not considered the futility standards, the District Court denied the Shareholders' motion to strike.13

The District Court then performed a thorough review of the allegations in the Second Amended Complaint. In particular, it addressed each of the seven events offered by the Shareholders as proof that sale negotiations were underway before the proxy vote and that the Investor Group had formed an intent to consummate the sale with GE/NBC during those pre-vote negotiations. The District Court found that none of the allegations in the Second Amended Complaint met the heightened pleading requirements of Rule 9(b) and the Reform Act, 15 U.S.C. S 78u-4(b)(1). Having failed to meet these threshold pleading requirements, the District Court granted the Investor Group's motion to dismiss the Second Amended Complaint. The Shareholders' appeal followed.

II.

A.

The District Court had jurisdiction over this securities fraud action pursuant to 15 U.S.C. S 78aa. We have jurisdiction over the District Court's final order pursuant to 28 U.S.C. S 1291. Our review of the District Court's order and its interpretation of the federal securities laws is

_____

13. The Shareholders have not challenged this aspect of the District Court's decision on appeal. Our review is limited, therefore, to the court's decision on the motion to dismiss.

21

plenary. See Oran v. Stafford, 226 F.3d 275, 281 n.2 (3d Cir. 2000) ("We exercise plenary review over the District Court's dismissal of the Amended Complaint for failure to state a claim, accepting plaintiffs' factual allegations as true. . . . We also have plenary review over the District Court's interpretation of the federal securities laws.").14 In reviewing the dismissal of the Shareholders' Second Amended Complaint, we apply the same standards applied by the District Court. See Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 346 (3d Cir. 2001).

B.

The Shareholders' claims require us to revisit the relevant standards applicable to motions to dismiss in the context of securities fraud actions brought under the federal

securities laws. As some of our recent decisions have illustrated, the analysis requires more than mere reference to the conventional standard applicable to motions under Rule 12(b)(6).

The applicable inquiry under Rule 12(b)(6) is well-settled. Courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny General Hospital v. Phillip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000). The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in

_____

14. Although we review the grant of a motion to dismiss, the basis for our plenary review is grounded in the standard applicable to motions for summary judgment because of the District Court's consideration of documents outside the pleadings. See Smith v. Johns-Manville Corp., 795 F.2d 301, 306 (3d Cir. 1986) ("Our standard of review over the district court's order is plenary. Although this case involves the denial of the government's motion to dismiss for lack of jurisdiction, the appropriate standard is the same as that for a motion of summary judgment because the court below considered documents outside the pleadings themselves in ruling on the motion.").

22

support of their claims. See Scheuer, 416 U.S. at 236. Dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See R.F. Lafferty, 267 F.3d at 346 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Nevertheless, we have also held that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. See In re Burlington, 114 F.3d at 1429. Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. See In re Nice Systems, 135 F. Supp. 2d at 565.

Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud. Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).15 As we have noted in previous decisions, "[t]his particularity requirement has been rigorously applied in securities fraud cases." In re Burlington, 114 F.3d at 1417 (citations omitted). Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." In re Nice Systems, 135 F. Supp.

2d at 577. The imposition of a heightened pleading requirement in fraud actions serves important objectives: "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." In re Burlington, 114 F.3d at 1418 (citations omitted).

While we have acknowledged the stringency of Rule 9(b)'s pleading requirements, we have also stated that, in

---

15. With respect to state of mind, Rule 9(b) also states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

applying Rule 9(b), courts should be "sensitive" to situations in which "sophisticated defrauders" may "successfully conceal the details of their fraud." Id. Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed. Id. Nevertheless, even when the defendant retains control over the flow of information, "boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." Id. (emphasis in original).

In order to state a viable claim pursuant to Rule 10b-5, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." Shapiro, 964 F.2d at 284 (citations omitted); see also In re Westinghouse, 90 F.3d at 710 (citations omitted). With regard to the showing of specificity, the Court has held that Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission. See Klein v. General Nutrition Cos., Inc., 186 F.3d 338, 345 (3d Cir. 1999) ("The complaint fails to attribute the statement to any specific member of GNC management. Fed. R. Civ. P. 9(b) requires, at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements.") (citations omitted).

Thus, Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany "the first paragraph of any newspaper story" -- that is, the "who, what, when, where and how" of the events at issue. In re Burlington, 114 F.3d at 1422 (citing DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

In addition to Rule 9(b), plaintiffs alleging securities fraud

must also comply with the heightened pleading requirements of the Reform Act, 15 U.S.C. S 78u-4(b)(1), (b)(2). Specifically, S 78u-4(b)(1) of the Reform Act requires plaintiffs to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.16

In In re Advanta, we reviewed the legislative history of the heightened pleading requirements of the Reform Act and noted that:

> The purpose of the Act was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlements; and (4) manipulation of clients by class action attorneys.

180 F.3d at 531 (citing H.R. Conf. Rep. No. 104-369, at 31 (1995), reprinted in, 1995 U.S.C.C.A.N. 679, 730).17 In light of these concerns, we found that by enacting the current version of the Reform Act, "Congress expressly intended" to "substantially heighten" the existing pleading requirements. Id. at 534 ("[A]doption of a 'strong inference' standard will substantially heighten the barriers to pleading scienter, a result Congress expressly intended.").

_____

16. In addition, with regard to any securities fraud claims, such as Rule 10b-5 claims, the Reform Act requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.S 78u-4(b)(2).

The District Court's thorough application of the Reform Act to the Shareholders' claims was confined exclusively to an analysis of the particularity requirement in 15 U.S.C. S 78u-4(b)(1) quoted in the text above. Because we concur with the District Court's analysis under S 78u-4(b)(1), we similarly limit our review to that pleading requirement.

17. Although the Court's review of the legislative history of the Reform Act occurred in the context of its discussion of the scienter prong, 15 U.S.C. S 78u-4(b)(2), the Court's general findings as to legislative intent apply equally to the particularity requirement, 15 U.S.C. S 78u-4(b)(1).

Procedurally, the importance of the Reform Act to the present appeal is that the heightened pleading requirement

of S 78u-4(b)(1) imposes another layer of factual particularity to allegations of securities fraud. The particularity described in S 78u-4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading. See S. Rep. No. 104-98, at 15, reprinted in, 1995 U.S.C.C.A.N. 679, 694 (in response to criticism that "courts of appeal have interpreted Rule 9(b) in different ways, creating distinctly different pleading standards among the circuits," Congress intended to adopt a"uniform and stringent pleading requirement."); see also In re Advanta, 180 F.3d at 534 ("This language echoes precisely Fed. R. Civ. P. 9(b) and therefore requires plaintiffs to plead 'the who, what, when, where and how: the first paragraph of any newspaper story.' ") (citations omitted).

III.

A.

With these heightened pleading requirements in mind, the District Court performed a detailed analysis of the Shareholders' allegations. Specifically, the court outlined each of the seven critical events alleged by the Shareholders in Part II.B, supra, and applied the requirements of Rule 9(b) and S 78u-4(b)(1). The Shareholders' principal contention on appeal is that the District Court erred in its interpretation of these events and in failing to draw all reasonable inferences therefrom in its favor. We agree that the facts alleged by the Shareholders failed to meet the applicable pleading requirements and begin our analysis with a review of the critical events alleged by the Shareholders.

1. The February 1996 Goldman Sachs Statement

The Shareholders claim that sometime in February 1996, an employee of Goldman Sachs "suggested to GE/NBC that if GE/NBC was willing to pay upwards of 400 million

dollars for capital lease treatment, depreciation rights and a purchase option of 93 percent of fair market value in 2022, it should simply buy the space it leased at Rockefeller Center." Second Amended Complaint, atP 68. At the outset, even if accepted as true, this vague allegation falls far short of substantiating sale negotiations between the Investor Group and GE/NBC, let alone an intent to consummate the sale. The fact that an employee of Goldman Sachs "suggested" this alternative does not even indicate that negotiations actually commenced. The District Court correctly noted that the allegation establishes no more than that someone at Goldman Sachs had considered a sale as an alternative. It does not establish that GE/NBC responded in any meaningful way, that Goldman Sachs advised the Investor Group to pursue a sale, or that the

Investor Group formed an intent to sell a portion of the Rockefeller Center.

In addition, the allegation lacks the requisite specificity required by both Rule 9(b) and the Reform Act. In Klein, the Court held that Rule 9(b) "requires, at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements." 186 F.3d at 345. Although the Shareholders argue that the identification of Goldman Sachs employees involved in the pertinent deals elsewhere in the Second Amended Complaint is sufficiently specific to inform the allegation above, that view is inconsistent with Rule 9(b) and the Reform Act. Because the allegation fails to identify the speaker, there is no indication that the speaker had the authority to speak on behalf of Goldman Sachs or that the employee was in regular contact with the Investor Group.

2. The Statement of Sheridan Sheckner

The Shareholders allege that on March 24, 1996, Sheridan Sheckner of Goldman Sachs spoke with representatives of GE Capital and NBC. In that discussion, Sheckner allegedly mentioned that an outright purchase of the leased property by GE/NBC would resolve seven of the eleven open negotiating points between them. Although the Shareholders are able to identify the speaker and the audience, this event, too, is insufficient to support the Shareholders' claims.

27

First, the statement merely reflects Sheckner's own consideration of a sale. It does not reveal any consideration by the Investor Group of that alternative, or any adoption by the Investor Group of Sheckner's contemplations. The statement does not in any way substantiate the Shareholders' belief that the Investor Group had formed an intent to sell a portion of Rockefeller Center to GE/NBC.

Second, the alleged discussion is more revealing as to what was actually being discussed at the time. Because an outright purchase is clearly identified as an alternative, the discussions were focused on something other than a sale -- discussions that had progressed to the point where eleven negotiating points had been identified. The Shareholders themselves concede that the primary focus of the negotiations was a modified lease agreement and that as late as January 1996, GE had no intention of consummating a sale: "The participants discussed a deal between the Investor Group and GE/NBC that was a cross between the bondable lease NBC had discussed with Tishman/Speyer in August and the terms of GE/NBC's deal as part of the Zell Group. GE/NBC was interested in gaining control of some of the operation systems at its leased premises as well as the right to depreciate its lease payments. . . . GE/NBC expressed no interest in becoming a part owner of the whole center, and had only a minimal appetite for any equity investment in the Investor Group." Second Amended Complaint, at P 61 (emphasis added).18

18. The Shareholders also emphasize alleged discussions between GE/NBC and co-defendant Scarlata in September 1995. According to them, "[i]n substance, GE/NBC made it clear to Messrs. Scarlata and Jarvis shortly before September 10 that GE/NBC would be willing to put up about $400 million in cash in connection with a credit lease financing, and that it would be willing to put up even more to own the property leased by NBC at the end of the lease term." Second Amended Complaint, at P 39 (emphasis added). As of 1995, it appears that GE/NBC had approximately 27 years remaining on its lease. As is evident from the Shareholders' own characterizations of these discussions, the economics of credit lease financing with an option to purchase at the end of a 27-year lease period are altogether different from those of outright ownership. Thus, in the very next sentence, the Shareholders acknowledge that "GE/NBC was not, however, interested in

Against this backdrop, Sheckner's statement cannot be interpreted as a part of ongoing negotiations to sell a part of Rockefeller Center or as evidence of the Investor Group's intent to consummate a sale. Rule 9(b) and the Reform Act require the Shareholders to identify specific negotiations dedicated to a sale and to come forward with particular allegations of the Investor Group's purported intent to consummate a sale. Sheckner's statement fails to meet these requirements.

### 3. The WSJ Article

According to the Shareholders, the May 6, 1996 WSJ Article stated that "over the past two years GE and NBC had been in discussions with every party that had had an opportunity to gain control of the Property, and that they began negotiating with defendants Rockefeller and Goldman Sachs in November 1995." Second Amended Complaint, at P 89. The article also quoted Michael Sherlock, an Executive Vice President of NBC, as saying "everything you can imagine was at one point, over the past year under negotiation." Id.

The Court agrees that the Shareholders "fail to explain how the article tends to show that the Investor Group and GE/NBC were negotiating a sale prior to the shareholder vote." Rockefeller, 131 F. Supp. 2d at 605. Presumably, the patently imprecise concept of "everything you can imagine" would encompass a sale, but because the negotiations "over the past year" included everything, there is no indication whatsoever when the lease negotiations morphed into negotiations for a sale. The only thing that the WSJ article establishes is that sometime before May 6, 1996, sale negotiations occurred; however, the article, even if accepted as true, does not state with the requisite specificity that sale negotiations commenced prior to the Shareholders' vote on March 25, 1996.

becoming a part owner of the entire complex. Instead GE/NBC was

primarily interested in obtaining relief from its'underwater' lease and, if possible, control of the physical plant systems . . . ." Id. Therefore, these discussions cannot form the basis of the Shareholders' allegations that actual sale negotiations were underway as of September 1995.

4. The NY Daily News Article

On June 6, 1996, Rick Cotton of NBC published an article which stated:

> In 1995, a seismic event occurred: Rockefeller Center went bankrupt. NBC, in considering ways to provide for its long-term studio and office needs, had discussions with various investors to find a solution that would benefit Rockefeller Center, NBC and New York City. After examining many alternatives, NBC began to consider the possibility of purchasing our current space at Rockefeller Center. . . . This purchase would give the potential new owners of the Center $440 million in new, up-front capital . . . .

Second Amended Complaint, at P 89; App. at 00843.

The NY Daily News Article lacks the requisite particularity in the same way as the WSJ Article. Cotton's article establishes that at some point after the bankruptcy of the partnerships, NBC considered a number of alternatives for providing for its corporate needs. Only "[a]fter examining many alternatives, NBC began to consider the possibility of purchasing" the space that it had been leasing. Again, exactly when NBC began considering a purchase is unclear. Cotton's article is just as consistent with the notion that GE/NBC began considering a purchase after the acquisition of RCPI by the Investor Group. And, the Daily News Article says nothing about the Investor Group or its intentions.

5. The February 20, 1996 Draft Letter & The April 23, 1996
        Sale Agreement

According to the Shareholders, the agreement evidencing the sale of a portion of Rockefeller Center to GE/NBC itself supports their claims. They assert that the April 23, 1996 sale agreement provided for: "a payment by GE/NBC of $440,000,000 ('the Purchase Price'), to be paid to the successor owner in the manner contemplated by the reorganization plan." Second Amended Complaint, at P 87 (emphasis in original). Furthermore, the Shareholders contend that the sale agreement referred to a draft letter of February 20, 1996 in which NBC assumed control over

heating, ventilation, air conditioning, elevator, and window washing systems of the space it occupied. The Shareholders argue that since the Partnerships had filed a Second

Amended Joint Plan of Reorganization on February 8, 1996 -- the same plan referred to in the sale agreement above -- the Investor Group must have "contemplated" the sale at that time. Also, because the sale agreement incorporated by reference the February 20, 1996 letter agreement, the sale must have been in consideration at that time as well.

The District Court held that the term "contemplated" in the sale agreement does not refer to the subject of negotiations between the Investor Group and GE/NBC when the Second Amended Reorganization Plan was filed, but rather to the manner of payment of sale proceeds as set forth in that plan. We agree, and find no plausible interpretation fitting the Shareholders' description. The phrase "a payment . . . to be paid to the successor owner in the manner contemplated by the reorganization plan" is a clear statement of how the parties to the sale intend to structure the payment, that is, as set forth in or "contemplated by" the reorganization plan. This is nothing more than an assurance given by the parties to the sale that the $440 million payment would be in accordance with the requirements of the prior reorganization plan. That assurance does not support the Shareholders' view that the sale itself was somehow in contemplation in February 1996, when the Second Amended Reorganization Plan was filed. The absence of any independent indication of a potential sale to GE/NBC in the reorganization plan supports the District Court's interpretation.

With regard to the incorporation by reference of the February 20, 1996 letter agreement, we agree that it also fails to substantiate the Shareholders' claims. First, the sequence of events does not logically flow to the conclusion that the Shareholders advocate. The fact that GE/NBC negotiated for some autonomy over physical plant systems in February 1996 does not mean that sale negotiations were underway at that point. In fact, it seems to point to the contrary conclusion, namely that as lessee they desired more control. A subsequent sale simply indicates that the negotiations progressed along a continuum, starting with

31

alternative lease options and advancing to arrangements contemplating more control in the hands of GE/NBC. Thus, the incorporation of the February 20, 1996 letter agreement in the April 23, 1996 sale agreement fails to show that the Investor Group had engaged in sale negotiations with GE/NBC before the date of the proxy vote, March 25, 1996.

6. Statements of Counsel at the Bankruptcy Hearing

The Shareholders point out that at a May 6, 1996 hearing relating to the bankruptcy proceedings of the Partnerships, counsel for the Partnerships stated that there had been "discussions for several weeks," pertaining to "the proposed transaction between the REIT designee and NBC." Second Amended Complaint, at P 90. Furthermore, counsel for RGI stated that "some time ago there had been some

consideration of doing a transaction with G.E. . . ." Id. at P 91. The Shareholders also contend that the bankruptcy court itself expressed surprise at the sudden announcement of the sale to GE/NBC and queried whether the "disclosure statement in some way might have been inadequate or inappropriate." Id. atP 92. From these statements, the Shareholders conclude that the Investor Group must have been negotiating the terms of the sale with GE/NBC before the proxy vote. Furthermore, the Shareholders believe that the revelations made at the bankruptcy hearing support their claim that the Investor Group had, in fact, formed an intent to consummate the sale. Neither of those two conclusions are justified by these statements.

First, the statements regarding the timing of negotiations relating to the sale to GE/NBC are unspecific. "Several weeks" before May 6, 1996 and "some time ago" lack the sort of precision necessary to meet the requirements of Rule 9(b) and the Reform Act. The statements shed no definitive light on the issue of exactly when negotiations began or when the Investor Group formed the intent to consummate the sale. As the District Court noted, "several weeks" before May 6, 1996, the date of the bankruptcy hearing, could be interpreted to include only the six-week period after the Shareholders' vote -- that is, the six weeks between March 25, 1996 and May 6, 1996. Therefore, there is nothing in either of the statements that even remotely suggests that

32

negotiations relating to the sale definitively commenced during a time when the Investor Group would have been obligated to disclose such negotiations.

As to the statement of counsel for RGI, the Shareholders attempt to manufacture an inference of fraud by noting that co-defendant David Rockefeller was also a principal of RGI. But as the District Court appropriately noted, RGI is not a defendant in this case, and the precise issue before the bankruptcy court involved the disclosure obligations of the Partnerships vis-a-vis their creditors in the Chapter 11 proceedings, not the duties of the Investor Group with regard to the proxy solicitation. Merely because David Rockefeller was a principal of RGI does not transfer the disclosure obligations of RGI to the Investor Group. The statements simply do not address who was negotiating, when the negotiations took place, and what exactly was on the table in February 1996. The conclusion that the Shareholders reach is supported only by speculations and inferences that are not justified under the set of facts alleged.

This last point also puts the statement of the bankruptcy court into perspective. The Shareholders invoke the phrases "inadequate or inappropriate" and "disclosure statement," implying that the disclosures in the Investor Group's proxy statement must also have been insufficient. It bears repeating that the court's statement was made in the

context of the Partnerships' bankruptcy proceedings. Furthermore, the obligations alluded to by the court pertain to the disclosure obligations of the Partnerships, not the Investor Group, in the bankruptcy proceedings. Again, those obligations are wholly distinct from the Investor Group's disclosure obligations in the context of its proxy solicitation. In short, the Shareholders have taken these statements out of their proper context. More importantly, the Shareholders' allegations fail to substantiate any actual ongoing negotiations between GE/NBC and the Investor Group before the proxy vote, an intent on the part of the Investor Group to consummate the sale, or any fraudulent misrepresentation or omission concerning the same.

7. The Letter to the New York State Department of Law

Shortly after the bankruptcy hearing described above, RCPI wrote to the New York State Department of Law on

May 22, 1996, primarily for the purpose of requesting that a "no-action letter" received in 1988 would remain valid as to the upcoming transfer of title to GE/NBC pursuant to the sale. The Shareholders highlight one line in the May 22 letter: "[The Partnerships have] filed for protection under the federal bankruptcy code and the proposed plan of reorganization contemplates that the Partnerships shall transfer fee title to certain units (including its reversionary rights) to NBC, and transfer fee title to all remaining units then owned by [the Partnerships] to RCPI." App. at 00990. Because the Partnerships filed their Second Amended Reorganization Plan on February 8, 1996, and because the May 22 letter states that that plan "contemplates" the transfer to NBC, the Shareholders conclude that sale negotiations must have been underway at least as early as February 8, 1996.

Again, the Shareholders have taken this statement out of context, resulting in a tortuous misinterpretation. Most importantly, the Shareholders' interpretation contradicts their discussion of the bankruptcy proceedings above, in which the Shareholders concede that the first time that the issue of the GE/NBC sale arose in the bankruptcy court was at the May 6, 1996 hearing. Therefore, it would have been impossible for the February 8, 1996 plan of reorganization to address the GE/NBC sale because, as far as the bankruptcy court was concerned, there was no such sale until May 6, 1996. And, as the proceedings before the bankruptcy court evidenced, the Partnerships' plan of reorganization was not a static set of simple steps. The plan was fluid, subject to uncertainties and disputes, and flexible enough to accommodate a sale of a portion of Rockefeller Center consummated after the Shareholders' vote. Thus, the statement that the "plan of reorganization contemplates" the sale to GE/NBC is completely consistent with the overall intent of the May 22, 1996 letter: to convince the Department of Law that the recently consummated sale to GE/NBC did not contravene the plan

of reorganization and, consequently, that the Department of Law should extend its no-action position.

In fact, the only plausible chronology of events is delineated by the Shareholders' own allegations: (1) a plan

of reorganization was, in fact, filed with the bankruptcy court in February 1996; (2) at some point after the proxy vote, the Investor Group and GE/NBC agreed to the sale of a portion of Rockefeller Center; (3) this disclosure was made to the bankruptcy court on May 6, 1996, at which time the bankruptcy court satisfied itself that the sale to GE/NBC was consistent with Partnerships' Second Amended Disclosure Statement and Plan of Reorganization; and (4) on May 22, 1996, RCPI requested that the New York State Department of Law approve the sale by seeking to extend the effect of the 1988 no-action letter to the GE/NBC deal. The fact that the Shareholders misinterpret statements made throughout the course of these events does not change the fact that their allegations do not substantiate their core claim of fraud -- that the Investor Group had engaged in negotiations relating to the GE/NBC sale prior to the proxy vote and that the Investor Group had formed an intent to consummate that sale during those pre-vote negotiations.

Having reviewed all of the critical factual events alleged by the Shareholders, we agree with the District Court that the Shareholders have failed to support their claims of fraud with the factual particularity required by Rule 9(b) and the Reform Act, 15 U.S.C. S 78u-4(b)(1).

B.

Notwithstanding the District Court's thorough, item-by-item examination of all of the Shareholders' allegations of fraud, the Shareholders contend that the District Court erred in two additional respects.

First, the Shareholders argue that the District Court ignored the Rule 12(b)(6) standard, requiring courts to draw all reasonable inferences in favor of the non-moving party. This argument ignores the impact of the Reform Act. In In re Advanta, we noted that "[a]lthough the Reform Act established a uniform pleading standard, it did not purport to alter the substantive contours of scienter. Under the heading 'Requirements for securities fraud actions,' the Act expressly characterizes subsections 21D(b)(1) and (b)(2) [15 U.S.C. SS 78u-4(b)(1) and (b)(2)] as imposing 'pleading

requirements.' " 180 F.3d at 534 (emphasis added). Similarly, in Oran, this Court stated that"[b]oth the PSLRA and Federal Rule of Civil Procedure 9(b) impose heightened pleading requirements on plaintiffs who allege securities

fraud." 226 F.3d at 288 (emphasis added). These decisions clarify that Rule 9(b) and the Reform Act impose independent, threshold pleading requirements that, if not met, support dismissal apart from Rule 12(b)(6). 19 Thus, in In re Burlington, the Court acknowledged that a complaint could pass muster under the traditional Rule 12(b)(6) analysis and still fail on Rule 9(b) grounds. 114 F.3d at 1424 ("We conclude, therefore, that while dismissal on Rule 12(b)(6) alone would not have been proper, the dismissal on Rule 9(b) grounds was."). In addition, the sanction of dismissal for failure to satisfy either of the heightened pleading requirements of the Reform Act is provided for in 15 U.S.C. S 78u-4(b)(3)(A). See In re Advanta, 180 F.3d at 531 ("Failure to meet [the Reform Act's] requirements will result in dismissal of the complaint."). Stated another way, unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the Reform Act, they may not benefit from inferences flowing from vague or unspecific allegations -- inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.

Second, the Shareholders assert that the District Court erred in taking a piecemeal approach in analyzing their factual allegations and ignoring the purportedly reasonable inference that it would have reached had it viewed their allegations under the totality of the circumstances. In essence, the Shareholders argue that if all of the critical events they allege are viewed as a whole, in conjunction with other allegedly suspicious coincidences, then the

---

19. In Florida State Board of Administration v. Green Tree Financial Corp., 270 F.3d 645, 660 (8th Cir. 2001), the court directly addressed the issue of the effect of the PSLRA on the traditional 12(b)(6) analysis: "The Reform Act modifies the ordinary Rule 12(b)(6) dismissal mechanism in two limited ways. First, whereas under Rule 12(b)(6), we must assume all factual allegations in the complaint are true . . . under the Reform Act, we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." (citations omitted).

36

reasonable inference is that the Investor Group had commenced negotiations for the sale of a portion of Rockefeller Center prior to the proxy vote and had formed an intent to consummate that sale. According to the Shareholders, the suspicious coincidences include the suspect timing of the GE/NBC sale just one month after the proxy vote and the fact that the purchase price paid by GE/NBC, $440 million, correlates almost perfectly with the amount of debt financing that the Investor Group intended to obtain, as disclosed in the proxy statement, $430 million.

The Shareholders' argument lacks merit for several reasons. As we have held before, fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity. See In

re Westinghouse, 90 F.3d at 712; see also In re Nice Systems, 135 F. Supp. 2d at 574. If, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal under 15 U.S.C. S 78u-4(b)(3)(A). While it is true that in other securities fraud contexts, the Court has endorsed a variant of the totality of circumstances approach, those occasions are reserved for cases presenting unusually suspicious circumstances. For instance, in the context of insider trading claims, the Court has consistently held that it will not infer fraudulent intent from the mere fact that some officers sold stock during a time when plaintiffs allege they possessed material, non-public information. See In re Advanta, 180 F.3d at 540; In re Burlington, 114 F.3d at 1424. Nevertheless,"if the stock sales were unusual in scope or timing, they may support an inference of scienter." In re Advanta, 180 F.3d at 540; see also In re Burlington, 114 F.3d at 1424 ("Instead, plaintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter.").

The Court finds no sound basis for adopting a totality of the circumstances approach in this case. First, we agree with the District Court's analysis insofar as each factual event alleged by the Shareholders fails to support a claim

of fraud with the requisite particularity. In addition, if the mere coincidences were as suspicious as the Shareholders contend, then a totality of the circumstances approach might warrant some consideration. That is not the case here, however. As the Investor Group points out, the fact that the sale to GE/NBC occurred one month after the proxy vote, rather than substantiating fraud, reflects the frenetic pace and scope of negotiations that financially troubled enterprises often experience.

As to the purported symmetry in the amount of the Investor Group's proposed debt offering and the actual sale price to GE/NBC, we strain to see how it would support the serious allegations of fraud asserted here. To set the purchase price in perfect symmetry with its refinancing obligations, the Investor Group would have to have had perfect, absolute control over such volatile factors as interest rates, market prices, and the skill of GE/NBC's negotiators. It is doubtful that when GE/NBC's negotiators discussed the purchase price, they had the financing needs of the Investor Group in mind. In any event, the Shareholders' attempt to support their claims of fraud with this purported symmetry is precisely the sort of speculative fraud by hindsight that the Reform Act was intended to eliminate. See, e.g., In re Advanta, 180 F.3d at 538 (holding that plaintiffs "may not rest on a bare inference that a defendant 'must have had' knowledge of the facts.").

Our ruling today also disposes of the balance of the

Shareholders' claims of fraud. Because the Shareholders have failed to plead with the requisite particularity the existence of pre-vote negotiations regarding the sale to GE/NBC and of the Investor Group's intent to consummate that sale, it follows that the Investor Group did not commit fraud when it disclosed what was actually taking place -- the lease financing negotiations with GE/NBC. Similarly, because the Shareholders have failed to allege the occurrence of negotiations before the proxy vote, it cannot be said that the Investor Group breached any duty to update its disclosures. The Shareholders' allegations fail to establish that the Investor Group had any such duty prior to March 25, 1999. See, e.g., In re Burlington, 114 F.3d at 1431-33, 1434 n.19.

38

IV.

For the reasons set forth above, we affirm the judgment of the District Court.20

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

---

20. In light of our decision today, we find it unnecessary to address the District Court's alternative basis for dismissal-- the immateriality of the alleged omissions. Similarly, we need not reach the Shareholders' argument that the case should be remanded to another District Judge because of the trial judge's purported bias or because of a wholly unsubstantiated intimation of a conflict of interest that was not addressed in prior proceedings. See Appellant's Opening Brief, at 32 n.12, 59-61. Vacatur and remand are not necessary, and "any alleged harm to [the Shareholders] is cured by our plenary review of the district court's decision." Klein, 186 F.3d at 342 (citations omitted).

39